**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wendy Miller DeSALVO,**
**Defendant–Appellant.**

No. 93–10686.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1994.

Decided Nov. 30, 1994.

Karen L. Landau, San Francisco, CA, for defendant-appellant.

Stephen L. Meagher, Asst. U.S. Atty., San Francisco, CA, for plaintiff-appellee.

Before: PREGERSON and WIGGINS, Circuit Judges, and LEW, District Judge.[*]

LEW, District Judge:

## I. Overview

On June 7, 1993 a jury found Appellant, Wendy DeSalvo guilty on eleven counts of an indictment charging conspiracy to defraud the United States and mail fraud. Pursuant to this verdict, on October 27, 1993, District Court Judge D. Lowell Jensen sentenced DeSalvo to 60 months imprisonment and ordered her to pay restitution in the amount of $970,166.75.

DeSalvo's conviction arose out of activities connected with her employment at H.W. Care, Inc. ("HWC"), a business founded by her sister and co-defendant in the case below, Kristina Rowland Brambila. DeSalvo was the Chief Financial Officer of HWC, a business that provided consulting services for medical care providers, essentially consisting of auditing work for hospitals and nursing homes.

As part of the services offered to providers, HWC would perform "lost charge audits," which entailed reviewing provider accounting records to uncover any potential under-billings of the Medicare program. When HWC undertook this service, it would enter into a contingency agreement providing that a portion of any money recovered by the provider from Medicare would be paid to HWC as a fee for its service.

Although the lost charge audits were shown to have been performed for a number of different providers, the grand jury only indicted DeSalvo and Brambila on charges relating to an audit they performed for Regency Hills Convalescent Hospital ("Regency Hills") in May and June of 1990. Pursuant to a plea agreement, Brambila pled guilty to

the charges arising out of this audit and testified against DeSalvo at trial.

DeSalvo's indictment included one count of conspiracy to defraud the United States and ten counts of mail fraud. All eleven counts of the indictment related to Medicare bills prepared and submitted by HWC on behalf of Regency Hills. The basis of the Government's allegations was that HWC submitted bills to Medicare for surgical dressings and bandages when the related surgeries had never been performed. These improper Medicare charges allowed Regency Hills to recover payments from Medicare to which it was not entitled. Under their contingency billing arrangement with Regency Hills and other providers, DeSalvo and Brambila profited by taking a percentage as high as 50% of these improper Medicare payments.

DeSalvo and Brambila presented themselves to providers as experts in Medicare billing practices and thus able to identify reimbursable items that the providers' own accounting personnel might have overlooked. Since the lost charge audits were performed on a contingency basis, the service was presented as a no lose proposition for the provider: If no money was recovered from Medicare, the providers would not be obligated to pay HWC.

By early 1991, DeSalvo was no longer working with HWC or her sister, Brambila, and had started her own Medicare billing service called Medical Reimbursement Consultants ("MRC"), which continued to perform lost charge Medicare audits. As part of an ongoing investigation of HWC's prior lost charge audits, federal authorities arranged for a meeting between DeSalvo and purported hospital administrators. At this meeting DeSalvo made a promotional presentation for the lost charge audit services that could be performed by her new business. This presentation was recorded on videotape and used as evidence at DeSalvo's trial.

In the videotaped presentation, DeSalvo claimed to have extensive experience in Medicare billing practices, and she substantially misrepresented the size, success rate

---

[*] Hon. Ronald S.W. Lew, United States District Judge for the Central District of California, sitting by designation.

508

and capacity of her business. Moreover, in the presentation DeSalvo described the same contingency fee arrangement for lost charge audits as had been used in HWC's audit of Regency Hills.

At DeSalvo's trial, her videotaped presentation was used as circumstantial subsequent similar acts evidence to show that she knew the claims she submitted to Medicare on behalf of Regency Hills were false. The Government alleged, and the trial court found below, that the promotion given on the videotape was probative evidence of DeSalvo's knowledge that the Medicare claims she submitted for Regency Hills were false. That is, the fact that DeSalvo acknowledged her experience in Medicare billing practices and continued to promote lost charge audits in the course of her own business illustrated that when she previously submitted lost charge audit claims for Regency Hills, she knew they were false.

In addition to their auditing work for Regency Hills, Brambila and DeSalvo were alleged to have been involved in a number of other lost charge audits. In total, Medicare was shown to have paid out nearly $5,000,000 in false claims as a result of their scheme. The audits done for these other providers were shown by the Government to be largely false, and the various providers eventually repaid Medicare for the improper amounts HWC's audits allowed them to recover. These repayments included money retained by the providers as well as the contingency fees paid to HWC. Thus, as a condition of Brambila's plea agreement and as part of DeSalvo's sentence, they were jointly and severally ordered to pay restitution to the providers for profits paid to them under the lost charge audit scheme. This restitution order applied to all improper lost charge audits performed by HWC, not just those performed for Regency Hills on which DeSalvo was convicted.

DeSalvo raises three issues on appeal: (1) whether the District Court abused its discretion in admitting the promotional videotape into evidence in that it was unfairly prejudicial under Rule 403 of the Federal Rules of Evidence, and was not similar subsequent acts evidence under Rule 404(b); (2) whether

the District Court erred in ordering restitution in excess of that allowed under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, because it applied the amended version of the Act in effect at the time of sentencing rather than the pre-amendment version in effect at the time the crimes DeSalvo was convicted of occurred; (3) whether the District Court erred in granting restitution by failing to properly consider DeSalvo's ability to pay. In its brief, the Government responds to all three of Appellant's contentions and raises a procedural argument that this Court lacks jurisdiction to review the District Court's orders regarding restitution because DeSalvo's objections to them are being raised for the first time on appeal.

## II. Analysis

### A. District Court's Admission of Videotape

The first substantive issue presented for review is DeSalvo's contention that the District Court erred in admitting as evidence the promotional videotape she made after leaving HWC, which described her new business and her knowledge and proficiency in performing lost charge audits. DeSalvo claims that this videotape was not similar conduct within the meaning of Rule 404(b) of the Federal Rules of Evidence. In essence, she argues that since the promotional presentation itself was not illegal, it could not have been used as similar acts evidence to imply her previous knowledge that the Medicare claims she was submitting on behalf of Regency Hills were false.

In addition, DeSalvo maintains that the videotape should have been excluded under Rule 403 of the Federal Rules of Evidence because misrepresentations contained within it made the tape more prejudicial to her than it was probative on the issue of her knowledge.

In a written order the District Court specifically dismissed DeSalvo's evidentiary objections. On the Rule 404(b) similar acts objection, the Court found, "In sum, the fact that DeSalvo continued to bill for non-surgical supplies after being accused of fraudulent

billing and during the time in which she claimed extensive experience regarding Medicare billing makes it more likely that she knew she was fraudulently billing all along and intended to do so." As to DeSalvo's allegation that the videotape was unfairly prejudicial, the Court found that while such prejudice existed, it was within the scope of prejudice permitted by this Circuit and did not substantially outweigh the tape's probative value.

### 1. Standard of Review

■ We review evidentiary questions for an abuse of trial court discretion. *United States v. Hill,* 953 F.2d 452, 455 (9th Cir. 1991); *United States v. Catabran,* 836 F.2d 453, 456 (9th Cir.1988).

### 2. Discussion

*a. district court's admission of videotape over defendant's Rule 404(b) character evidence objection.*

■ Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, *intent,* preparation, plan, *knowledge,* identity or absence of mistake or accident....

Fed.R.Evid. 404(b) (emphasis added). This Rule has been interpreted as one of inclusion and generally allows admission of other crimes or acts evidence " 'except where it tends to prove criminal disposition.' " *United States v. Ayers,* 924 F.2d 1468, 1472–73 (9th Cir.1991) (quoting *United States v. Rocha,* 553 F.2d 615, 616 (9th Cir.1977)). This Court applies a four-part test to determine the admissibility of evidence under Rule 404(b): (1) there must be a sufficient degree of evidence for the jury to find that the other acts were in fact committed; (2) the other acts evidence may only be introduced to prove a material issue in the case; (3) the other acts must not be too remote in time to the conduct charged; and (4) the other acts must be sufficiently similar to the charged conduct when they are being introduced to show intent. *Ayers,* 924 F.2d at 1473 (citing *United States v. Spillone,* 879 F.2d 514, 518–20 (9th Cir.1989), *cert. denied,* 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990)).

In this case, the parties do not dispute that the first three elements of the *Ayers* test are met. On the first element, the promotional videotape itself provides sufficient evidence that the subsequent act was in fact committed. As to the second element (use of the subsequent acts evidence to prove a material issue) the videotape was admitted to show DeSalvo's knowledge that the Medicare claims she previously submitted were false, a necessary component of the crimes she was charged with. Again, this element is apparent and not challenged. The third element of the *Ayers* test, proximity in time, has also been met. The specific conduct on which DeSalvo was convicted (that is, the submission of false claims for Regency Hills) occurred in May and June of 1990, while the videotape was made during the summer of the following year. Under the circumstances, it cannot be said that the videotaped subsequent conduct was too remote in time. *See Ayers,* 924 F.2d at 1474 (finding that subsequent acts taking place over the course of two years after the charged crime were not too remote).

■ Therefore, the only ground for argument in this case involves the fourth element of the *Ayers* test: sufficient similarity between the subsequent acts and the conduct being charged. DeSalvo contends that the District Court erred in admitting the videotape because the conduct portrayed on the tape "is not similar to the offenses charged in the indictment." Appellant's Brief at 20. She goes on to claim that "[t]he promotional presentation was no more than advertising, as distinguished from the actual submission of claims to Medicare," and that therefore, admittedly false statements in the presentation went only to her character as a person who lies, rather than to her knowledge that past Medicare claims were fraudulent. *Id.*

An examination of the crimes DeSalvo was charged with reveals that her argument must fail. In overruling the objection on this issue, the trial court found that the distinction DeSalvo was trying to draw between the

conduct charged and that exhibited on the videotape was "without merit in lieu of the fact that she is simply charged with mischaracterizing and billing for nonsurgical dressings and bandages."

In essence, the ten counts of mail fraud brought against DeSalvo alleged her involvement in a scheme to convince medical care providers that they could reap substantial, no-risk rewards for subscribing to a lost charge Medicare audit. The focus of these charges was that DeSalvo knew that the lost charge Medicare claims she was submitting on behalf of providers were false. Since it was undeniable that false Medicare claims had been submitted, DeSalvo's primary defense was that she had no such knowledge that the claims were false. To establish knowledge, the Government introduced the videotape, which showed DeSalvo promoting a Medicare provider audit program mirroring the mail fraud scheme on which she was indicted. On the videotape, DeSalvo claimed knowledge and expertise in furnishing Medicare providers with substantial, no-risk benefits by subscribing to lost charge audit services. The videotape illustrated DeSalvo's promotion of and proficiency in lost charge audits, thus tending to show that when she previously submitted false Medicare claims, she knew them to be false. Similar cases have found applicability of Rule 404(b) in less persuasive circumstances. *See United States v. McDonald,* 576 F.2d 1350, 1356 (9th Cir.) (finding that developer's subsequent statements on land deals implied knowledge of previously fraudulent conduct), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978); *see also United States v. Bibo–Rodriguez,* 922 F.2d 1398, 1399 (9th Cir.) (holding that despite differences in method, evidence of subsequent drug smuggling could be admitted to show prior knowledge and intent), *cert. denied,* 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991). Therefore, DeSalvo's Rule 404(b) objection will be dismissed and the District Court's finding on this issue sustained.

*b. district court's admission of videotape over defendant's unfair prejudice objection.*

■ Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. Rule 403 has been interpreted as a final check on the admission of extrinsic acts evidence, which may only be received if "on balance, its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant." *United States v. Hodges,* 770 F.2d 1475, 1479 (9th Cir.1985).

DeSalvo argues that admission of the videotape, including its undeniably false statements and misrepresentations, allowed her jury to draw the impermissible impression that because she lied on the tape, she was likely to have engaged in the fraud with which she was charged. This argument, however, is misplaced. As the Government's brief suggests, if anything, the false statements DeSalvo gives on the videotape make it *more* relevant to her knowledge that the past Medicare claims she submitted were false. That is, the fact that DeSalvo grossly misrepresented the details of the lost charge audit she was promoting on the tape goes to show her fraudulent intent underlying the audits themselves, exactly the point on which the Government claims the videotape is relevant. This additional relevance cannot be deemed a ground on which we could characterize the tape as showing *unfair* prejudice outweighing the videotape's probative value. *See Hodges,* 770 F.2d at 1479. Therefore, DeSalvo's Rule 403 objection shall likewise be dismissed, and the District Court's finding on this issue shall be sustained.

## B. District Court's Award of Restitution under the Victim and Witness Protection Act

*1. Appellate Court's Jurisdiction to Hear Restitution Issues not Raised Below.*

■ As a preliminary matter, we reject the Government's contention that DeSalvo's failure to raise objections to the restitution order below waives her right to appeal it before this Court. Some decisions of this Circuit have, in the context of restitution orders, stated the general rule that an issue

not raised before the trial court will not be addressed on appeal. *See United States v. Cloud,* 872 F.2d 846, 857 (9th Cir.1989), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1991). However, our more recent decisions have expressly rejected the Government's argument. *United States v. Baker,* 25 F.3d 1452, 1456 (9th Cir.1994). In *Baker,* we found that an exception to the general rule applied when, as in the present case, the issue on appeal was purely one of law. *Id.* In *Baker,* as in the case presently before this Court, the issue on appeal not raised below dealt with the extent of a trial court's authority to order restitution under the VWPA. Since the sentencing issue is before this Court purely as a question of law, DeSalvo's failure to raise an objection to the imposition or amount of restitution below will not act to prevent us from considering it. *Id.; United States v. Kimball,* 896 F.2d 1218, 1219 (9th Cir.1990) (recognizing appellate court jurisdiction over questions of law when objections were not presented below), *vacated in part on other grounds,* 925 F.2d 356 (9th Cir.1991) (en banc) (per curium). Therefore the Government's jurisdictional argument is overruled and we shall examine the merits of DeSalvo's restitution appeal.

## 2. Standard of Review

■ The legality of a sentence is reviewed *de novo. United States v. Jackson,* 982 F.2d 1279, 1281 (9th Cir.1992). The question of whether a sentence violates the prohibition in Article I of the U.S. Constitution against *ex post facto* laws is also reviewed *de novo. United States v. Carson,* 988 F.2d 80, 81 (9th Cir.), *cert. denied,* ——— U.S. ———, 114 S.Ct. 142, 126 L.Ed.2d 105 (1993). A sentence falling within statutory limits, however, is left to the discretion of the trial court, and is reviewed only for an abuse

of discretion. *United States v. Koenig,* 813 F.2d 1044, 1046 (9th Cir.1987).

## 3. Discussion

The second substantive issue presented on this appeal concerns the restitution order imposed by the District Court as part of DeSalvo's sentence. This order required DeSalvo to pay $970,166.75 in restitution to some nineteen Medicare providers who were victimized by HWC's lost charge audit scheme.[1] This order was imposed despite the fact that the indictment against DeSalvo charged her with conduct specifically involving only one provider, whose losses were limited to $68,384.36.

DeSalvo acknowledges that the greater amount may properly be ordered under current statutory provisions. Nonetheless, she contends that the restitution statute in force at the time of the conduct underlying her conviction limited the restitution the District Court could impose to amounts directly related to the conduct for which she was convicted, that is, to the $68,384.36 HWC received pursuant to the Regency Hills audit.

■ Federal courts do not have the inherent power to order restitution. *United States v. Hicks,* 997 F.2d 594, 600 (9th Cir. 1993). The power to order restitution must therefore stem from some statutory source, in this case, the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663.[2] The VWPA provides that "[t]he court, when sentencing a defendant convicted of an offense under this title … may order … that the defendant make restitution to any victim of the offense." 18 U.S.C. § 3663(a)(1). Effective November 29, 1990, Congress amended the VWPA by adding § 3663(a)(2), which provides that

---

1. Upon discovery of the false Medicare claims submitted by HWC on behalf of various providers, the providers were required to reimburse the Medicare program for the full amount erroneously recovered. This included amounts paid to and retained by HWC under the lost charge audit contingency agreement.

2. Prior to 1987, a district court could order restitution under either of two federal statutes, the Federal Probation Act, 18 U.S.C. § 3651 (re-

pealed), or the Victim and Witness Protection Act, 18 U.S.C. §§ 3579, 3580. However, effective November 1, 1987, the Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat.1987, repealed the restitution provision of the Federal Probation Act and renumbered the restitution sections of the VWPA. Thus, after November 1, 1986, the only federal statute providing for restitution is the VWPA, found at 18 U.S.C. §§ 3663, 3664.

[f]or the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

Pub.L. No. 101–647, 104 Stat. 4863, 4931 (Nov. 29, 1990).

### a. ex post facto effect of 1990 VWPA amendment.

The version of the VWPA in effect at the time of DeSalvo's sentencing would normally control. *Hughey v. United States,* 495 U.S. 411, 413 n. 1, 110 S.Ct. 1979, 1981 n. 1, 109 L.Ed.2d 408 (1990). DeSalvo contends, however, that the District Court's application of the post-amendment version of the VWPA to her case[3] violated the U.S. Constitution's *ex post facto* clause.[4] DeSalvo's contention is based on a claim that the conduct underlying her conviction, and upon which she was indicted, had ended by the effective date of the 1990 amendment. Should we find that the 1990 amendment *did* effect a substantive change in the law of restitution and that DeSalvo's underlying conduct had ended by the time the amendment took effect, it is clear that the District Court's sentencing order would be a violation of the *ex post facto* clause, and thus, would have to be vacated for resentencing under the pre-amendment VWPA. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (noting that for the *ex post facto* prohibition to apply, the law "must apply to events occurring before its enactment" and "must disadvantage the offender affected by it"); *United States v. Baker,* 25 F.3d 1452, 1457 n. 7 (9th Cir.1994) (noting that if the 1990 amendment to the VWPA effected a substantive change, it could not be invoked in sentencing for conduct taking place before that date).

In order to find a violation of the *ex post facto* clause, we will first have to find that the conduct underlying DeSalvo's conviction terminated *before* November 29, 1990 (the amendment's effective date). Second, we will have to determine that the amendment effected a substantive change in the law, subjecting DeSalvo to the possibility of a harsher penalty than was provided for under the pre-amendment law. *See Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977).

### (1) timing of the conduct underlying DeSalvo's conviction.

To determine whether the District Court's use of the amended version of the VWPA violated the *ex post facto* clause, we must examine the indictment itself to determine when the charged conduct took place. DeSalvo argues that the conduct underlying her conviction, as charged in the Government's indictment, ended in October, 1990, *prior to* the effective date of the 1990 amendment to the VWPA (November 29, 1990). Thus, she claims that the District Court should have sentenced her to restitution under the pre-amendment statute, which would have limited restitution to "the loss attributable to the specific conduct underlying the conviction," that is, $68,384.36. *See United States v. Sharp,* 941 F.2d 811, 815 (9th Cir. 1991). The Government responds to DeSalvo's contention by asserting that the conduct charged in its indictment continued *through* October, 1990 and into 1991, beyond the effective date of the 1990 amendments to the VWPA.

In DeSalvo's indictment, the preamble to both the conspiracy to defraud, and the mail fraud charges reads the same: "Beginning at a date unknown to the Grand Jury but not later than April 23, 1990 and *continuing through October 1990* in the State and Northern District of California and elsewhere

---

3. The District Court did not specify which version of the VWPA it used in sentencing DeSalvo to pay restitution for all profits made under the lost charge audit scheme. We assume—as both parties concede—that the amended version of the act was applied. Appellant's Brief at 28–29; Appellee's Brief at 20.

4. The *ex post facto* clause of Article I provides that neither Congress nor any state legislature may apply a criminal law retrospectively where doing so would work to a defendant's disadvantage. U.S. Const., Art. I, § 9, cl. 3; *Miller v. Florida,* 482 U.S. 423, 431–32, 107 S.Ct. 2446, 2451–52, 96 L.Ed.2d 351 (1987).

. . ." [5] DeSalvo contends that this language in the indictment indicates that the conduct underlying her conviction was over by the end of October, 1990, one month before the effective date of the 1990 amendments to the VWPA. This is thus the basis for her *ex post facto* claim.

The Government counters by making two assertions: (1) that the word "through" as used in the indictment means continuing *past* October, 1990, and (2) that additional language specific to the mail fraud charges indicates that the indictment did contain allegations of conduct continuing past the November 29, 1990 effective date of the VWPA amendment.

■ Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). "The indictment should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Givens*, 767 F.2d 574, 584 (9th Cir.), *cert. denied*, 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985); *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). When, as in this case, a defendant does not challenge the sufficiency of the indictment until after the verdict, the court will generally review it under a more liberal standard.[6] *See United States v. Zavala*, 839 F.2d 523, 530 (9th Cir.), *cert. denied*, 488 U.S. 831, 109 S.Ct. 86, 102 L.Ed.2d 62 (1988).

The Government's contention that use of the phrase "through October, 1990" in the indictment should be interpreted as meaning "at least through October, 1990" is plausible, if not readily apparent. The Government supports its interpretation by citing additional language in the indictment charging DeSalvo with mail fraud. Specifically, the indictment alleged that "it was a part of the [mail fraud] scheme to cease operations of H.W. Care [HWC] after a sufficient number of 'lost charge audits' drew regulatory scrutiny and to recommence the scheme using fictitious business names." The Government argues that since it is uncontested DeSalvo did recommence business under a different name in 1991, the "scheme" alleged in the indictment continued past the effective date of the 1990 VWPA amendment, and the amended version of the Act should therefore apply.

While the Government's interpretation of the indictment may be reasonable, some courts have expressed particular concern with the sufficiency of an indictment when it alleges the existence of a scheme, and such a scheme is an element of the crime with which a defendant is charged.[7] In the context of a restitution order, the Seventh Circuit, in *United States v. Bennett*, 943 F.2d 738 (7th Cir.1991), stated: "The scheme concept is by its nature an amorphous one, and may only support an award of restitution if it is defined with specificity. A contrary rule would allow vague allegations of a scheme to support restitution based upon broad, unsubstantiated conduct." *Id.* at 741; *see also United States v. Turino*, 978 F.2d 315, 318 (7th Cir.1992) (stating that in order to sentence a defendant to pay restitution, the initial indictment must "specifically define" the fraud

---

5. The specific conduct underlying the convictions in this case, that is, the lost charge audit performed by HWC for Regency Hills Hospital, took place in May and June of 1990. The Government apparently used the dates "April 23, 1990 *continuing through* October 1990" in the indictment because it was during this period that HWC actually received payment from Regency Hills under its contingency payment agreement.

6. The probation officer's pre-sentence report contained specific provisions calling for restitution to be awarded for all acts connected with the lost charge audit scheme, not just those underlying the conviction. Moreover, at sentencing the District Court explicitly inquired on the pro-

priety of restitution. Nonetheless, DeSalvo made no objection to the restitution order until this appeal.

7. The District Court's restitution sentence related to DeSalvo's conviction for mail fraud under 18 U.S.C. § 1341. There are two elements required to prove mail fraud, (1) a scheme to defraud, and (2) use of the mails for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Acknowledging the requisite scheme element, we have found that mail fraud is not a continuing offense and is complete upon mailing. *United States v. Niven*, 952 F.2d 289, 293 (9th Cir.1991).

scheme), *cert. denied,* —— U.S. ——, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993); *United States v. Brothers,* 955 F.2d 493, 497 (7th Cir.) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 142, 121 L.Ed.2d 94 (1992). The Seventh Circuit's restrictive reading of the indictment in restitution sentences stems from the Supreme Court's holding in *Hughey v. United States* that "the conduct underlying the offense of conviction establishes the outer limits of a restitution order." 495 U.S. 411, 420, 110 S.Ct. 1979, 1984, 109 L.Ed.2d 408 (1990).

Thus, unless the mail fraud scheme on which DeSalvo was indicted was described in sufficient detail in her indictment, restitution based on that scheme must be restricted. As to the Government's claim that a broader scheme should be implied, the *Hughey* Court's restrictive interpretation of the VWPA "precludes such speculative awards." *Bennett,* 943 F.2d at 741.

■ Recognizing the special concerns raised by restitution awards in the context of mail fraud, we adopt the Seventh Circuit's approach and read DeSalvo's indictment narrowly.[8] This approach places the burden on the Government, which has control over the drafting of the indictment, to include language sufficient to cover all acts for which it will seek restitution. More importantly, a restrictive reading will prevent the Government from using "vague allegations of a scheme to support restitution based upon broad, unsubstantiated conduct." *Bennett,* 943 F.2d at 741. In the present case, the Government gives no justification for its failure to specifically allege that the scheme on which it was indicting DeSalvo continued into 1991. Nor does it support its contention that the phrasing "April 23, 1990 and *continuing through October 1990*" indicated an intent to cover conduct in 1991, other than by saying that such an interpretation is a plausible one. Adopting the Seventh Circuit's rationale for giving an indictment alleging a scheme a restrictive reading, the Government's interpretation must fail.

We therefore interpret DeSalvo's indictment as alleging a scheme ending in October, 1990, *before* the effective date of the 1990 VWPA amendment. So finding, the District Court should have applied the pre-amendment version of the VWPA, assuming as discussed below, that the amendment effected a substantive change in the law of restitution and thereby subjected DeSalvo to the possibility of a harsher sentence.

### (2) substantive impact of the 1990 amendment.

■ In *Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Supreme Court held that under the pre–1990 amendment version of the VWPA, restitution could only be ordered "for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 413, 110 S.Ct. at 1981. The Defendant in *Hughey* was indicted on several counts of unauthorized credit card use and several counts of theft by a postal worker. After pleading guilty to a single count of unauthorized credit card use, Hughey was nonetheless sentenced to restitution for all of the charges underlying his indictment. *Id.* at 413–14, 110 S.Ct. at 1981–82. The Supreme Court's decision overturning this broad restitution sentence left open the question of how broad a restitution sentence could be imposed when the conduct of which a defendant was convicted involved a criminal scheme or conspiracy. *See United States v. Cronin,* 990 F.2d 663, 666 (1st Cir.1993). Taking the position of a majority of other circuits, we interpreted *Hughey* to say that "even where the offense of conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction." *United States v. Sharp,* 941 F.2d 811, 815 (9th Cir.1991); *see also United States v. Pivorotto,* 986 F.2d 669, 673 n. 5 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 90, 126 L.Ed.2d 58 (1993); *United States v. Jewett,* 978 F.2d 248, 252 (6th Cir. 1992); *United States v. Wainwright,* 938

---

8. The impact of this Court's restrictive interpretation is minimized by the 1990 amendment to the VWPA. For any charged conduct occurring after the November 29, 1990 effective date of the amendment, the Government is free to request, and the District Court free to impose, restitution based on all elements of a charged scheme.

F.2d 1096, 1097–98 (10th Cir.1991); *United States v. Stone,* 948 F.2d 700, 703–04 (11th Cir.1991). *But see United States v. Bennett,* 943 F.2d 738, 741 (7th Cir.1991) (interpreting *Hughey* to say that restitution could be awarded for injuries caused by a criminal scheme that were not part of the specific offense underlying the conviction).

When Congress amended the VWPA in 1990, it appeared to overrule this Court's decision in *Sharp.* 18 U.S.C. § 3663(a)(2); *see United States v. Soderling,* 970 F.2d 529, 533 n. 8 (9th Cir.1992). The relevant provision of the 1990 VWPA amendment states,

> For the purpose of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2). Section (a)(2) acts to clarify the definition of "victim" in Section (a)(1), which states, "The court, when sentencing a defendant convicted under this title . . . may order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1).

Most cases examining the impact of the 1990 VWPA amendment have found that it effected a substantive expansion of the previous law of restitution, in that it partially overruled the Supreme Court's restrictive interpretation of the VWPA in *Hughey. United States v. Cronin,* 990 F.2d 663, 666 (1st Cir.1993) (noting that Congress "has amended the statute in favor of broad restitution"); *United States v. Jewett,* 978 F.2d 248, 252 (6th Cir.1992) (same); *United States v. Seligsohn,* 981 F.2d 1418, 1422 (3d Cir.1992) (noting that the 1990 amendment was "intended to change the *Hughey* interpretation of the statute by enlarging the courts' power to order restitution beyond that permitted by *Hughey*"); *United States v. Arnold,* 947 F.2d 1236, 1237 & n. 1 (5th Cir.1991) (suggesting that the 1990 amendment increased

the restitution penalty available). *But see United States v. Welsand,* 23 F.3d 205, 207 (8th Cir.1994) (stating that the 1990 amendment "does not explicitly extend the contours of the word 'offense' "). We have previously acknowledged in dicta the substantive impact of the 1990 VWPA amendment, *United States v. Jackson,* 982 F.2d 1279, 1282 n. 1 (9th Cir.1992) (noting that this Court's restrictive interpretation in *Sharp* has been overruled by the 1990 VWPA amendment).

Thus, the consensus of courts addressing the issue is that the 1990 VWPA amendment *did* have a substantive impact on the amount of restitution a court could order when a defendant is convicted of an offense involving a scheme, conspiracy, or pattern. Despite some statements to the contrary, see *United States v. Baker,* 25 F.3d 1452, 1457 n. 7 (9th Cir.1994), and *Welsand,* 23 F.3d at 207, we will accept the majority view that the 1990 VWPA amendment did have a substantive impact on the law of restitution.

Finding that the conduct DeSalvo was charged with did not continue past the effective date of the 1990 amendment to the VWPA, and that that amendment did have a substantive impact on the law of restitution, we must reverse the restitution order imposed as part of DeSalvo's sentence in that it violates the *ex post facto* clause of the United States Constitution.[9] Thus, DeSalvo's restitution sentence in the amount of $970,166.75 shall be overturned and the case be remanded to the District Court for resentencing pursuant to the pre-amendment version of the VWPA.

### III. CONCLUSION

The evidentiary objections raised by DeSalvo shall be dismissed, and the District Court's admission of the videotape evidence sustained. On the issue of restitution, we have jurisdiction to consider a purely legal challenge to DeSalvo's conviction order. Under this challenge, we find that the District Court imposed an order of restitution in excess of that permitted under the pre–1990

---

9. Remanding this case for resentencing renders moot DeSalvo's claim that restitution cannot be ordered for audits performed by HWC after she left that organization, that is, after December

1990. In addition, the remand for resentencing will nullify DeSalvo's claim that the District Court failed to adequately consider her ability to pay in imposing its restitution award.

amendment of the VWPA. As such, the restitution order, as imposed, violates the *ex post facto* clause of the U.S. Constitution, and therefore, DeSalvo's sentence must be reversed. This case is therefore reversed in part and remanded to the District Court for resentencing pursuant to the pre-amendment version of the VWPA.

**SUSTAINED in part, REVERSED in part and REMANDED for resentencing.**