JOURNAL ENTRY and OPINION
The grand jury returned a three-count indictment charging the defendant Lashon Sawyer with murder, felonious assault, and endangering children in connection with the death of her four-year-old daughter, Sidney. A jury found the defendant guilty of the child endangering count, but deadlocked on the murder and felonious assault counts. The court declared a mistrial on those counts and ordered a new trial. In a second trial, the jury returned guilty verdicts on the remaining two counts.
The state tried the case on the theory that the defendant engaged in a pattern of abusive conduct towards the child that culminated with her striking the child so hard in the abdomen as to rupture her small intestine, create an infection and cause death.
The coroner gave an opinion that the child died from peritonitis caused by a blunt impact to the abdomen that perforated the child's small intestine. The medical evidence showed that this perforation or rupture could have been caused by a "quick hard localized blow" to the abdomen. Once the small intestine had been perforated, bacteria set in, causing the peritonitis. This would result in a fever with nausea and vomiting, leading to "stupor, coma and death."
The coroner also noted that the child bore a number of scars and bruising that he characterized as "blunt injury" and "abusive" in type. These ranged from bruises on the face and buttocks, to scars on the face and body. The coroner concluded that a fresh bruise on the child's stomach was caused by a punch.
A pediatric trauma physician corroborated the coroner's testimony concerning the effects of a perforated small intestine. She testified that she received a call from paramedics that they were en route to the emergency room with a small child in full arrest. The paramedics arrived with the child at 10:49 a.m. The physician saw that the child had a hugely swollen belly, as if she had a basketball in her abdomen. All efforts to revive the child failed.
The physician noted that the child's body was cold, indicating that she had been dead for longer than a brief time perhaps for several hours. Further proof of the time of death came in the form of lividity — a process where blood begins to pool in areas of the lifeless body. These facts did not correspond to information obtained by the EMS crew that the child had collapsed suddenly. The time of death also contradicted information supplied to the physician by the defendant. The defendant said that the child had a cold, had slept in a bed with the defendant, and rose the next morning but did not look well. The defendant tried to give the child some water, but the child vomited the water and became incontinent. The physician likewise thought these facts were inconsistent with the child's conditions at the time. Because of these inconsistencies, the physician called the police.
A police detective testified that he spoke with the defendant and the defendant's boyfriend and learned the child began to complain about her stomach between 9:00 p.m. and 9:30 p.m. the evening before her death. The child vomited at least twice between 9:30 p.m. and 11:00 p.m. The defendant's boyfriend was staying with the child (the defendant was at work) and gave the child some cold medicine. The following morning, the defendant's boyfriend checked in on the child and found her so weak that she could not stand. The defendant then scheduled a doctor's appointment for the child, but her condition was so poor that the boyfriend called for emergency medical services. The detective said that the defendant specifically said the child was breathing when the paramedics arrived to take the child to the hospital. In an interview with the detective following the child's death, the defendant admitted that she had a prior case with the Cuyahoga County Department of Children and Family Services. She also told the detective that her boyfriend cared very much for the child and would not hurt her.
The case involving the Department of Children and Family Services began just one month before the child's death. An intake social worker with the Department of Children and Family Services said that she received a priority telephone call from the child's day care provider alerting the social worker to possible abuse perpetrated against the child. The child bore multiple marks on her body ranging from bruises to scars to burns on her hands. When confronted with these marks, the defendant was hostile to questions about them. She denied being the source of the marks, saying that if she had hit the child it would have left a bigger mark. Some of the marks were explained; others went unaccounted.
Another witness testified that she was called to the hospital and on her arrival learned that the child died. She said that the defendant told her "she had whipped [the child] the other day." The witness testified to a prior conversation with the defendant in which the defendant commented that the child "made her sick sometimes because she was so bad. She was too much for her to handle." The witness said that about one month before the child's death, she noticed the child had a burn on her hands, a mark on her leg and a bruise on her forehead. She asked the child about one of those marks, but the child would not answer. She did say that she once saw the mother hit the child in the forehead with a hairbrush.
Yet another witness, the boyfriend's mother, testified that when she first learned of allegations of abuse against the child, she told the defendant that she would be checking up on the child. In a conversation with the defendant on the night of the child's death, the defendant told the boyfriend's mother that she did not know how the child died. However, the boyfriend's mother visited the defendant in jail and in a conversation the defendant admitted that she swung so hard at the child "she don't remember where she hit her." The boyfriend's mother went on to say:
 She told me that she picked up a belt, hit her. "I picked up a belt and I hit her on the side of the face," and she said, she was leaving out. Sidney said, something smart, so "I turned around and I start swinging. All I remember doing was leaving a bruise on her arm." I said, "Maybe you hit her in the stomach." "I don't know where I hit her. I was swinging so hard."
The boyfriend's mother also characterized the defendant's reaction to her child's death as being "no hurt, no anything on her face."
The defendant's boyfriend provided the bulk of the testimony leading up to the events on the day of the child's death. He said that he first became aware of possible abuse perpetrated by the defendant against the child in March 2000. The child's natural father approached the boyfriend and asked him whether he had been the source of a knot on the child's forehead. The boyfriend denied ever having struck the child, and the child later told him that knot appeared after she fell off the couch and hit her head. As for the burn marks on the child's hands, the boyfriend said the child gave him two different stories: either she burned them while holding her hands under very hot water while brushing her teeth or that she touched a hot oven. He said the defendant told him that the burns had to have come while the child was brushing her teeth.
The boyfriend also testified that on many occasions he saw the defendant mete out discipline that in his opinion "went over the line." He saw the defendant spank the child with a sandal and hit her with a purse strap.
On the morning before the child's death, the boyfriend rose from bed around noon. The defendant was scheduled to work that day from 3:30 p.m. to 11:00 p.m. The boyfriend knew that the defendant had promised to take the child into work with her that day as part of a program where employees could take their child into work for the day. As the defendant prepared to leave for work that day, however, it became clear to the child that the defendant would not take her to work as promised. Despite being told that she had to stay home, the child continued to follow the defendant out of the house. Twice, the defendant spanked the child for refusing to stay in the house. The defendant finally used the deadbolt on the door to keep the child from following her. Stymied, the child asked the boyfriend to open the door for her. The boyfriend obliged and the child followed the defendant down the street. Watching from a window, the boyfriend saw the defendant grab the child, "smack her a couple of times" and drag the child by the back of her coat into the house. They went into the child's bedroom and the defendant closed the door. The boyfriend said the defendant "began to hit her numerous times" and then he heard the child hit the floor and say "ouch" loudly. While the defendant and the child were behind the closed door, the boyfriend heard the child say, "Mommy, you don't have to whoop me. I just want to go to work with you."
When the defendant opened the door and left the child's bedroom, he asked the defendant if she had pushed the child on the floor. The defendant replied, "No, Sidney fell." He described the defendant as being angry. She took his house key and left for work. He and the child sat on a couch together and watched television. He said that the child was upset because she could not go to work with her mother.
A short while later, the boyfriend's cousin arrived at the house. The defendant's boyfriend explained that the defendant had taken his house key and wondered if he could go to the defendant's place of employment and retrieve the key for him. The cousin agreed and later returned with the key. At about 5:00 p.m., the boyfriend and his cousin left the child with a neighbor and went to conduct some business. The neighbor said that although the child played with other children, she was not as active as the other children. The boyfriend and his cousin returned about 8:00 p.m., the boyfriend took the child back to the house and they watched television in separate rooms. About an hour later, the child came out and complained that her stomach hurt. The boyfriend told her to lie down, but the child vomited just fifteen minutes later, and then again another fifteen minutes later. He said that the child was sweating, although she felt cold to him. At some point, the boyfriend gave the child some Alka Seltzer© brand cold medicine. When the defendant came home an hour later, they decided to give the child some Theraflu© brand medicine. The medicine did not help, and the child continued to complain that her stomach hurt. The boyfriend wondered whether they should take the child to the hospital, but the defendant disagreed, saying that she did not want to wait in an emergency room all night because she had to work the next day.
At around midnight, the boyfriend's cousin returned. After hearing about the child's condition, the cousin offered to drive the child to the hospital, but the defendant refused his offer. The cousin left and the boyfriend took the child into his bed, saying that he did not want her to sleep alone. He said that she felt colder than she did earlier, and that she was still sweating. The child said her stomach still hurt.
When the boyfriend awoke, the child was not in his room, but sleeping in her own bed. He saw that she was blue in the face and "hard as a rock, you know, kind of stiff." She was unresponsive. He called for emergency medical services. While he was on the telephone, the defendant dressed the child and brought her into the living room. The paramedics arrived and tried to resuscitate the child while taking her to the emergency room.
The boyfriend admitted that he pleaded guilty to a count of involuntary manslaughter in connection with the child's death. He said he understood the charges stemmed from his failure to report the ongoing abuse and failure to seek immediate medical treatment for the child.
The defendant defended on the theory that her boyfriend committed the acts of abuse that led to the child's death. She did not, however, present any evidence on this point. Her only witness was a representative of her employer who testified that the defendant's employer did not recognize a day where employees could bring their children into work for the day.
 I
The defendant first argues that the court committed plain error by failing to give complete jury instructions on the potential for bias and self-interest as factors in weighing on the credibility of witnesses. She claims this instruction was necessary because testimony of the defendant's boyfriend should have been viewed with great suspicion.
The defendant's reference to the error in jury instructions being plain in nature is, of course, an admission that no objection was made to those instructions. We review claims of plain error by considering whether it can be said that but for the error, the outcome of trial would clearly have been otherwise. State v. Nicholas (1993), 66 Ohio St.3d 431, 436.
The court did not err as it gave a proper jury instruction on the credibility of witnesses. The court instructed the jury that it must weigh the evidence and the credibility of witnesses by considering:
 the interest or bias that the witness has in the outcome of the verdict, the witnesses appearance, manner and demeanor while testifying before you, the witness's candor and frankness, or the lack of candor and frankness * * * and any or all other facts and circumstances surrounding the testimony, which in your judgment would add or detract from the credibility and weight of the witness's testimony.
This instruction fully charged the jury that it could consider the boyfriend's personal interest or bias in the case. There was no error.
The defendant's argument really seems to be suggesting that the court should have given the instruction required by R.C. 2923.03(D), which is required when an alleged accomplice of the accused testifies against the accused in a case where the accused is charged with complicity in the commission of an offense. The statute requires the court to inform the jury that an accomplice's testimony affects the credibility of that testimony and leaves that testimony open to "grave suspicion."
That instruction could not have been given, as the boyfriend was not an accomplice. He told the jury that his charge of involuntary manslaughter stemmed from his failure to prevent abuse, rather than an affirmative act of child abuse. In fact, the evidence presented at trial did nothing to show that he acted as an accomplice, so the defendant's claim that the court should have given an instruction in line with R.C. 2923.03(D) is unfounded.
 II
The defendant next argues that her convictions for murder and felonious assault are against the manifest weight of the evidence. She claims there is no credible evidence that she caused the physical contact that resulted in the child's death. Although she acknowledges that the testimony all pointed to her and not the boyfriend, she characterized the state's evidence as suspect. She further criticizes the pathological evidence of death.
Claims that a conviction is against the weight of the evidence are rarely proven, as the credibility of witnesses and the weight to be given testimony and evidence is a matter solely within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230.
The state made a convincing case of the defendant's guilt, showing that she engaged in a pattern of abusive conduct toward the child that culminated with her striking the child so hard as to rupture her small intestine and permit the onset of infection and death. This case was bolstered by the boyfriend and other witnesses who collectively acknowledged the boyfriend's close relationship with the child. None of the witnesses could say that they saw any indication of abusive conduct displayed by the boyfriend.
Only one witness, the child's natural father, gave testimony that might have led the trier of fact to believe that the boyfriend had abused the child. The father testified that he saw the child with bruising over her eye and spoke to the boyfriend about it. The boyfriend denied these allegations and said that his only form of discipline was to make the child stand in the corner. The father saw the child again just one month later and she said that the boyfriend had not touched her.
This small evidence against the boyfriend was not enough to shake our confidence in the outcome of the trial. It may be that some of the witnesses were interested in obtaining a favorable outcome for the boyfriend, but the jury obviously knew that. It must be noted that the boyfriend had pleaded guilty to manslaughter charges. This constituted an affirmative recognition of his part in the crimes committed against the child.
The evidence showed without exception that the boyfriend and his family treated the child as though she were his own child. He seemed genuinely distraught over her death, while other witnesses said that the defendant had no reaction at all to the child's death. The jury could reasonably consider all of this as suggesting the mother's guilt. The verdicts were not against the manifest weight of the evidence.
 III
The defendant claims the state engaged in prosecutorial misconduct by eliciting unduly emotional testimony from an EMS paramedic who responded to the defendant's house to treat the child. The defendant does not specifically cite to any testimony, other than to say that the state asked a series of questions "regarding how [the paramedic] was personally affected by this case * * *."
We can summarily reject this argument because it is not separately argued in the brief as required by App.R. 16(A). See, also, App.R. 12(A)(2). The defendant does not cite to any portion of the paramedic's testimony, and leaves to us the task of divining what parts of the testimony she finds to be offending. We have the discretion to disregard this assignment.
Despite this, we have reviewed the paramedic's testimony. We assume the offending line of questioning came when the state asked the paramedic whether the call to administer aid to the child had any affect on her. Over a defense objection, the paramedic told the jury:
 I just — I had a hard time with the call. I mean, I'm a parent, and I have a four-year-old, so for some reason, with this particular run, I just had a hard time letting go. And I mean I usually * * * You know, usually we get a call, you treat the patient, drop them off at the hospital, that's the end of it. You go to your next call, but for some reason, this call * * * I couldn't let it go.
The paramedic went on to tell the jury that she missed two weeks of work as a result of this incident.
This line of questioning was improper, as it was obviously intended to elicit an emotional response that was irrelevant to the charged counts of murder and felonious assault. "* * * [I]t is improper for the state to rouse the jury to convict merely by exciting their indignation against the defendant, against defense counsel, or against the crime itself."State v. Nobles (1995), 106 Ohio App.3d 246, 270.
The state's line of questioning did not ask the paramedic to testify to events that occurred contemporaneously with her involvement in treating the child. Nor did the question seek any relevant information that would have a bearing on the defendant's guilt or innocence. The state's motive in presenting this testimony is too clear to admit any reasonable argument in support of the question. We can underscore our conclusion by noting that the state appears to concede this point, as it makes no real attempt to counter the defendant's argument.
A claim of prosecutorial misconduct must show not only that the state engaged in improper conduct, but that the conduct deprived the accused of a fair trial. State v. Smith (1984), 14 Ohio St.3d 13, 14. On this record, we cannot find that the paramedic's remarks deprived the defendant of a fair trial. The jury was fully aware of the tragic nature of the very young child's death, and there was other evidence that tended to show the impact it had on the boyfriend and his family. So this evidence did not stand alone in a way that would lead us to conclude that it deprived the defendant of a fair trial. We stress that our conclusion is not meant to minimize the state's error, but to show that it did not rise to the level of reversible error on this record.
 IV
The defendant also complains that the court violated her right to confront witnesses when it found a witness who had testified at the first trial to be "unavailable" and permitted the state to present that witness's testimony from the first trial.
Former testimony is excepted from the hearsay rules if the declarant is demonstrated to be unavailable under the above rule. See Evid.R. 804(B)(1). A witness may be declared "unavailable" if the witness "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means." See Evid.R. 804(A)(5). In State v. Jester
(1987), 32 Ohio St.3d 147, 154, the Supreme Court said that prior recorded testimony may be introduced if (1) after a good faith effort to secure the witness's presence at trial, the witness is shown to be unavailable and (2) there must have been an opportunity for cross-examination and there must be present adequate indicia of reliability such that a statement may be placed before the jury though there is no confrontation of the declarant.
The state could not procure the witness for the second trial because she had very recently given birth to a child by Caesarean section and was suffering from postoperative complications from a uterine infection. The court received confirmation of this fact from a representative of a hospital obstetrics department. The state acted in good faith in trying to procure the witness for trial.
Moreover, the witness's testimony in the first trial corresponded closely with that given by other witnesses. She testified that she saw the child the afternoon before her death, trailing after the defendant saying, "[m]ommy, mommy, I want to go with you." She went on to say that she saw the child later that afternoon and the child appeared to be sluggish.
Both of these facts corresponded to evidence given by other witnesses. Certainly, the witness's testimony that the child followed the defendant outside was corroborated by the boyfriend. And testimony that the child appeared sluggish was corroborated by the woman who was watching the child when the boyfriend and his cousin went to run an errand.
There is no question that the witness gave sworn testimony in the first trial and was subjected to cross-examination under oath. The same defense counsel represented the defendant at both trials. The witness's testimony was corroborated by other witnesses. We find the requisite degree of reliability was present. The court did not err by finding the witness unavailable for the second trial.
 V
The defendant also complains that the court erred by permitting improper other acts testimony relating to past allegations of abuse she perpetrated against the child. She claims that the state failed to produce any substantial proof that she inflicted any of the child's injuries that were documented at trial.
Evidence of other acts is prohibited if it is offered to prove the character of a person in order to show that the person acted in conformity with those other acts. See Evid.R. 404(A). Other acts evidence may be admissible, however, to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See Evid.R. 404(B). It has been said that Evid.R. 404(b) is a rule of inclusion, not exclusion. United States v. Long (C.A.3, 1978),574 F.2d 761, 766, certiorari denied (1978), 439 U.S. 985 (referencing identical federal rule). Admission of the other acts evidence should be allowed except where such evidence tends to prove only criminal disposition. See United States v. DeSalvo (C.A.9, 1994), 41 F.3d 505,509. In order to be admissible, the other acts used must not be too remote in time, and must be closely related in nature, time, and place to the offense charged. State v. Henderson (1991), 76 Ohio App.3d 290, 294. As with other decisions relating to the admission of evidence, we review the court's decision to permit other acts evidence for an abuse of discretion. State v. Green (2000), 90 Ohio St.3d 352, 369.
The court did not abuse its discretion by permitting the other acts evidence because the evidence satisfies the predicate test for admissibility. The alleged acts of prior abuse were not too remote in time, having occurred just one month prior to the offense. Importantly, the acts appeared to constitute a pattern of abusive conduct directed against the child. These were material points because the defendant completely denied having abused the child in any form and blamed the abuse on the boyfriend. Finally, the evidence of other acts was sufficiently cogent to prove that the defendant did commit acts of abuse.
 VI
The defendant complains that counsel performed ineffectively by repeatedly failing to object to other acts evidence and by failing to request a jury instruction on witness credibility. Our previous discussion of each of those claims should make clear that counsel's objections would not have been well-taken, hence counsel could not have violated an essential duty to the defendant.
All of the defendant's assignments of error lack merit.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, A.J., and COLLEEN CONWAY COONEY, J., CONCUR.