67 F.3d 1421
 43 Fed. R. Evid. Serv. 155, 95 Cal. Daily Op.
Serv. 8022,
95 Daily Journal D.A.R. 13,764
UNITED STATES of America, Plaintiff-Appellee,
v.
Clayton Ross BRACY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Wayne HOGLE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Perry GILMARTIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Melvin GARFINKLE, Defendant-Appellant.
 Nos. 93-10726, 93-10727, 93-10782 and 94-10033.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 7, 1995.
Decided Oct. 12, 1995.
 
 Edward B. Horn, Reno, Nevada, for defendant-appellant Clayton Ross Bracy; Mary E. Boetsch, Sinai, Schroeder, Mooney & Boetsch, Reno, Nevada, for defendant-appellant David Wayne Hogle; Kenneth R. Howard, Reno, Nevada, for defendant-appellant Perry Joseph Gilmartin; Loren Graham, Zephyr Cove, Nevada, for defendant-appellant Richard Garfinkle.
 Daniel G. Bogden, William M. Welch II, and L. Anthony White, Assistant United States Attorneys, Reno, Nevada, for plaintiff-appellee.
 Appeals from the United States District Court for the District of Nevada.
 Before: BRUNETTI, THOMPSON and HAWKINS, Circuit Judges.
 MICHAEL DALY HAWKINS, Circuit Judge:
 
 
 1
 On June 25, 1991, a federal grand jury returned an indictment charging the defendants herein, along with nine other individuals (the "Regas defendants"), with numerous counts of drug trafficking and related criminal activity. The grand jury subsequently returned four superseding indictments. All of the indictments were sealed by order of the district court. The four defendants here proceeded to trial on the fourth superseding indictment and were convicted on several of the indictment's twenty-nine counts.[1] They now appeal. This court has jurisdiction pursuant to 28 U.S.C. Sec. 1291. We affirm.
 
 FACTUAL AND PROCEDURAL HISTORY[2]
 
 2
 This case concerns a narcotics manufacturing and distribution organization headed up by Jay Jeffrey Regas that operated principally in Nevada, California, Oregon, and Washington. Defendants-Appellants Clayton Bracy, David Hogle, Perry Gilmartin, and Richard Garfinkle (aka "Bubba"), were charged as participants in the Regas conspiracy.
 
 
 3
 Garfinkle was involved in distributing methamphetamine and cocaine for the Regas organization as early as 1984 or 1985. He and Regas met with Paul Fleischer, who delivered them one or two pounds of methamphetamine. Garfinkle also travelled to San Diego to pick up the proceeds from an eight-pound methamphetamine deal. Garfinkle was also involved in the cocaine end of Regas's drug business; his role was to take care of those "dirty jobs" Regas did not want to do himself.
 
 
 4
 In 1986, Gilmartin and Hogle rented a home together on Marne Drive ("Marne Drive residence") in Reno. From there, the two roommates trafficked in small quantities of cocaine that they obtained from Rene Herrera and Wallace Wright. Additionally, Troy Regas (son of Jay) was a regular supplier of cocaine to Gilmartin and Hogle.
 
 
 5
 Herrera and Wright also began to distribute cocaine provided by Regas. Regas would "front" the cocaine, i.e. provide it to his dealers with understanding that he would be paid back out of sale proceeds. On at least one occasion, Herrera and Wright were unable to pay Regas for the cocaine fronted to them and were thus left with a sizable drug debt owing to the Regases.
 
 The Herrera Kidnapping and Beating
 
 6
 Regas was not apparently a patient creditor. Sometime after Herrera and Wright incurred this debt, Gilmartin and Hogle were sent to find Herrera and collect. After a two day search, on July 15, 1986, Herrera was located in a motel in the Sparks, Nevada area. Gilmartin and Hogle, now accompanied by Bracy, went to Herrera's room to pick him up. Gilmartin and Hogle went in Herrera's room and convinced him that he might want to take a ride. Herrera was then "escorted" from his room to a pickup truck in the parking lot, where Bracy, armed with a MAC-10 handgun, was waiting. Bracy held Herrera at gunpoint as the quartet drove back to the Marne Drive residence. During the ride, Herrera pleaded with Hogle to "work something out," to which Hogle replied, "it's too late, you will have to talk to Bubba and Troy."
 
 
 7
 Shortly after Gilmartin, Hogle, and Bracy took Herrera into the Marne Drive residence, Troy Regas and "Bubba" Garfinkle arrived. Garfinkle began to hit Herrera's face with his fists and open hands. Garfinkle and Gilmartin proceeded to beat Herrera with a large metal flashlight and a rifle stock. The beating stopped long enough for Herrera to make telephone calls in an attempt to obtain some money. While Herrera was making these calls, Garfinkle held a gun to Herrera's knees.
 
 
 8
 The telephone calls were to no avail for Herrera and Bracy began kicking Herrera in the back of the head. Gilmartin then shoved the barrel of a rifle in Herrera's mouth while Bracy said, "Let's just kill him now."
 
 
 9
 Herrera apparently had not been searched before his abduction and managed to pull a gun from his back pocket and point it at Garfinkle. The others in the room jumped on Herrera to disarm him, and during the struggle Herrera fired the gun several times. Concerned that the gunshots might attract unwanted attention, Bracy took Herrera to Bracy's house. At Bracy's, Troy Regas told Herrera that he must get the money "or next time the beating would be worse."
 
 
 10
 A week after the beating, Herrera participated in a drug deal with an undercover DEA agent, who then arrested Herrera. Immediately after his arrest, Herrera began cooperating with the police. Many of the statements Herrera made at that time were inconsistent with his subsequent grand jury and trial testimony.
 
 Bracy's Conviction
 
 11
 The jury acquitted Bracy of fifteen of the sixteen counts against him, convicting him of use of a firearm during a crime of violence, 18 U.S.C. Sec. 924(c). He was sentenced to a five-year prison term.
 
 Hogle's Conviction
 
 12
 Hogle was convicted on four counts, including violent crime in aid of racketeering, 18 U.S.C. Sec. 1952B(a)(1) (now Sec. 1959); use of a firearm during a crime of violence, 18 U.S.C. Sec. 924(c); possession with intent to distribute and distribution of cocaine, 21 U.S.C. Sec. 841(a)(1); and threatening a witness, 18 U.S.C. Sec. 1512(a)(1) & (3). He was found not guilty on twelve other counts. The court imposed a ten-year sentence on the violence in aid of racketeering count and a consecutive five-year term on the firearm count. On the possession with intent to distribute count and the witness threat count, the district court imposed ten and five year sentences, to run concurrent to the violence in aid of racketeering count.
 
 Gilmartin's Conviction
 
 13
 Gilmartin was convicted on the same counts as was Hogle. He was also found guilty by the jury on two counts of possession with intent to distribute cocaine, but the district court granted Gilmartin's motion for acquittal on those counts. He received a thirteen year sentence on the violence in aid of racketeering count, with consecutive sentences of five and three years on firearm and witness threat counts. On the possession with intent count, the district court imposed a ten year sentence, to run concurrent with the sentence on racketeering count. He was found not guilty on twelve other counts.Garfinkle's Conviction
 
 
 14
 The court granted Garfinkle's motion for acquittal on two unlawful firearm counts, but Garfinkle was convicted on fourteen of the remaining counts, including conspiracy to possess with intent to distribute and to distribute cocaine and methamphetamine, 21 U.S.C. Sec. 846; possession with intent to distribute and distribution of cocaine, 21 U.S.C. Sec. 841(a)(1); violent crime in aid of racketeering, 18 U.S.C. Sec. 1952B(a)(1) (now Sec. 1959); use of a firearm during a violent crime, 18 U.S.C. Sec. 924(c); interstate travel in aid of racketeering, 18 U.S.C. Sec. 1952(a)(3); possession with intent to distribute and distribution of methamphetamine, 21 U.S.C. Sec. 841(a)(1); use of a firearm during drug trafficking, 18 U.S.C. Sec. 924(c)(1); and maintenance of a place for manufacture, distribution and storage of controlled substances. Garfinkle was acquitted on a possession with intent to distribute count and a witness threat count.
 
 
 15
 The district court determined that the Sentencing Guidelines applied to Garfinkle's convictions, and sentenced him to 262 months on the conspiracy count, with consecutive sentences of 120 months, 60 months, and 120 months on the violence in aid of racketeering, firearm during a violent crime and firearm during drug trafficking counts. Concurrently running sentences of 120 months and 60 months were imposed on all other counts of which he stood convicted.
 
 DISCUSSION
 
 16
 I. Sealing of the Indictments and Pre-Indictment Delay
 
 A. Standard of Review
 
 17
 The denial of a motion to dismiss for impermissible pre-indictment delay is reviewed for abuse of discretion. United States v. Butz, 982 F.2d 1378, 1380 (9th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993); United States v. Sherlock, 962 F.2d 1349, 1354 (9th Cir.1989).
 
 
 18
 B. Did the Sealing of the Indictments Toll the Statute of Limitations?
 
 
 19
 The crimes of which Bracy, Hogle and Gilmartin were convicted occurred between January and October, 1986. Garfinkle's convictions were for crimes taking place between July 1986, and January 1993. The original indictment was returned sealed in June 1991, shortly before the five-year statute of limitations for many of the charges had run. No warrants were issued, however, until the fourth superseding indictment was returned, on January 20, 1993, after the limitations period.
 
 
 20
 "Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment." United States v. Pacheco, 912 F.2d 297, 305 (9th Cir.1990). See also United States v. Sears, Roebuck & Co., 785 F.2d 777, 778-79 (9th Cir.), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). The defendants concede that this rule also applies to sealed indictments, as long as the indictments were properly sealed for legitimate prosecutorial objectives. In such cases, the indictment is deemed found for purposes of the statute of limitations when it is returned, rather than when it is unsealed. United States v. Lakin, 875 F.2d 168, 170 (8th Cir.1989). See also, United States v. Richard, 943 F.2d 115, 118 (1st Cir.1991); United States v. Srulowitz, 819 F.2d 37, 40-41 (2d Cir.), cert. denied, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); United States v. Ramey, 791 F.2d 317, 321 (4th Cir.1986).
 
 
 21
 The defendants argue, however, that the government failed to demonstrate legitimate prosecutorial objectives for sealing the indictments. The government contends that it had legitimate reasons for sealing the indictments beyond the statute of limitations period. First, the government points to the ongoing nature of its investigation into the Regas organization. Second, as the government began to look into financial crimes, some delay was necessary as the IRS joined the investigation. Finally, the government argues that the violent nature of the Regas organization, and the need to protect the safety of potential witnesses, justified sealing the indictments.
 
 
 22
 The district court was apparently persuaded by these reasons. Ruling on the defendants' motion to dismiss various counts of the indictment for failure to meet the statute of limitations, the district court expressly found that "the government has provided legitimate, prosecutorial objectives justifying the sealing of the indictments in this case until January 20, 1993." Given this finding, the court's denial of the defendants' motion was not an abuse of discretion. See United States v. Sherlock, 962 F.2d 1349, 1355 (9th Cir.1989) (holding that ongoing investigation was a legitimate reason for pre-indictment delay); United States v. Tornabene, 687 F.2d 312, 317 (9th Cir.1982) (same).
 
 
 23
 C. Did the Pre-indictment Delay Violate Due Process?
 
 
 24
 The defendants argue that even if the statute of limitations was tolled by the sealed indictments, the resulting pre-indictment delay violated their Fifth Amendment due process rights. This court applies a two-pronged test to determine if a pre-indictment delay violates due process. First, we must examine "whether a defendant suffers actual prejudice as a result of the delay." United States v. Butz, 982 F.2d 1378, 1380 (9th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993). The defendants' proof of prejudice "must be definite and not speculative." Id. Second, if prejudice exists, we "balance the length of the delay with the reasons for it in deciding whether the defendant's rights were violated." Id. See also Sherlock, 962 F.2d at 1353; United States v. Moran, 759 F.2d 777, 780-81 (9th Cir.1985), cert. denied, 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986).
 
 
 25
 As proof of actual prejudice, the defendants offer Exhibit 13--a compilation of trial testimony showing numerous instances where witnesses stated that they could not remember a particular fact or event. The defendants also presented expert testimony that, as time passes, human memory fades and becomes susceptible to post-event information.
 
 
 26
 This court has "emphasized that protection from lost testimony generally falls solely within the ambit of the statute of limitations." Moran, 759 F.2d at 782 (citing United States v. Pallan, 571 F.2d 497 (9th Cir.), cert. denied, 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978)). In Pallan, we also questioned whether lost testimony due to dimmed memories could ever be sufficiently prejudicial so as to violate due process. 571 F.2d at 500-01. Thus, since we determined that the statute of limitations was properly tolled, the defendants' claims of prejudice based on failed memories lack merit.
 
 
 27
 Even if we were to consider the defendants' due process claims, the result would be unchanged. Exhibit 13, while voluminous, does not meet the defendants' "heavy burden to prove that pre-indictment delay caused actual prejudice." Butz, 982 F.2d at 1380. Many of the events that witnesses could not recall occurred after the original indictment was returned, and so could not be attributed to the pre-indictment delay. Additionally, many of the entries do not support the defendants' claim of actual prejudice because examination of the full transcript shows that the witnesses often went on to answer the question, or could not recall a fact for a reason other than the passage of time. Moreover, the defendants fail to show prejudice because other evidence often provided details of the event a witness forgot, or the fact forgotten was trivial or did not have any exculpatory value. Finally, the passage of time did not preclude the presentation of exculpatory evidence, and did not prevent effective cross-examination by the defendants.
 
 
 28
 Because we hold that the defendants have failed to establish actual prejudice from the passage of time, we need not determine whether the reasons for the delay outweigh the length of the delay. Butz, 982 F.2d at 1380.[3] The district court's denial of the defendants' motion to dismiss based on pre-indictment delay was not an abuse of discretion.II. Brady-Giglio Claims
 
 A. Standard of Review
 
 29
 Alleged Brady violations are reviewed de novo. United States v. Woodley, 9 F.3d 774, 777 (9th Cir.1993). To prove a Brady violation, the defendant must show a failure to disclose material evidence. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); see also Woodley, 9 F.3d at 777; United States v. Tham, 884 F.2d 1262, 1266 (9th Cir.1989).
 
 
 30
 B. Did Garfinkle Waive His Brady Claim?
 
 
 31
 Garfinkle contends that the government failed to reveal the complete criminal background of one of the government's key witnesses, Paul Fleischer, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The government claims that Garfinkle waived this issue by not raising it before the district court. According to the government, Garfinkle should have filed a post-trial motion raising his Brady claim, in order to develop a record for review. In support of its position, the government cites United States v. Smith, 924 F.2d 889, 893 (9th Cir.1991) (holding that a sufficiency of the evidence claim is waived unless raised before the district court).
 
 
 32
 The government's waiver argument and its reliance on Smith is misplaced. Garfinkle was unaware of his potential Brady-Giglio claim until additional information was disclosed during the second trial of the severed group of defendants.[4] This information did not come to light until March 14, 23 and 24, 1994--three months after Garfinkle had filed his notice of appeal in this case. "The filing of a notice of appeal is an event of jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 401, 74 L.Ed.2d 225 (1982); see also United States v. Ortega-Lopez, 988 F.2d 70, 72 (9th Cir.1993). It defies logic to suggest that Garfinkle waived a claim by not raising it before a court that lacked jurisdiction to consider it. We will reach the merits of Garfinkle's Brady-Giglio claim.
 
 
 33
 C. Did the Government Suppress Brady-Giglio Material?
 
 
 34
 In Brady, 373 U.S. at 87, 83 S.Ct. at 1196, the Supreme Court held that suppression by the government of evidence favorable to the defendant violates due process. The Brady rule extends to impeachment evidence, if the reliability of the witness may be determinative of the defendant's guilt or innocence. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In his brief, Garfinkle outlines the information he claims the government wrongfully withheld, including criminal activity in Florida and Wisconsin, and Fleischer's cooperation with law enforcement in those states to avoid prosecution or receive favorable treatment. According to Garfinkle, Fleischer's testimony was "essential" for Garfinkle's methamphetamine conspiracy conviction in count 3, and was "crucial" for his vicarious liability convictions on counts 14, 15, 16, 17, 18, 19, 21, 22, 23, and 25. Garfinkle argues that the incomplete disclosure of the witness's criminal history impaired Garfinkle's ability to impeach Fleischer, in violation of the Brady-Giglio rule.
 
 
 35
 Contrary to Garfinkle's assertions, however, the government did not suppress information about Fleischer's criminal background. In mid-April 1993, the government provided the defense with a printout from an NCIC computer search, as well as two reports detailing Fleischer's criminal history. This disclosure provided all the information necessary for the defendants to discover the alleged Brady material on their own, so the government was not guilty of suppressing any evidence favorable to Garfinkle. United States v. Aichele, 941 F.2d 761, 764 (9th Cir.1991) ("When, as here, a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government."); see also Moore v. Illinois, 408 U.S. 786, 794, 92 S.Ct. 2562, 2567, 33 L.Ed.2d 706 (1972) (listing suppression of evidence as one element of a Brady claim); United States v. Dupuy, 760 F.2d 1492, 1501 n. 5 (9th Cir.1985) ("[S]uppression by the Government is a necessary element of a Brady claim."). Given Garfinkle's inability to prove governmental suppression, his Brady claim fails.[5]
 
 
 36
 III. Sufficiency of the Evidence Regarding Counts Eight and Nine
 
 A. Standard of Review
 
 37
 There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Lennick, 18 F.3d 814, 819 (9th Cir.1994).
 
 
 38
 B. Count Eight--Did the Defendants Participate in a Violent Crime in Aid of Racketeering Activity?
 
 
 39
 18 U.S.C. Sec. 1959 (formerly Sec. 1952B) proscribes the commission of violent crimes "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." In United States v. Vasquez-Velasco, 15 F.3d 833 (9th Cir.1994), this court outlined the elements necessary to prove a Sec. 1959 violation: (1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed a violent crime; and (4) that they acted for the purpose of promoting their position in the racketeering enterprise. Id. at 842; see also United States v. Concepcion, 983 F.2d 369, 381 (2d Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).
 
 
 40
 For their roles in the Herrera kidnapping and beating, Hogle, Gilmartin and Garfinkle were convicted, under count eight, of a violent crime for the purpose of maintaining or furthering their positions in a racketeering enterprise. They argue that there was insufficient evidence to show that a racketeering enterprise existed, and even if one existed, their membership in the enterprise was not shown by sufficient evidence.[6]
 
 
 41
 Viewed in the light most favorable to the government, there is sufficient evidence to support the defendants' convictions on count eight. To make its case, the government had to prove the enterprise existed and was engaged in racketeering activity separate and distinct from the acts charged in count eight. Vasquez-Velasco, 15 F.3d at 842; United States v. Bledsoe, 674 F.2d 647, 664 (8th Cir.), cert. denied 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The government presented ample testimony regarding the structure of Regas's organization, and showed that it was engaged in racketeering activity before and after the Herrera kidnapping. At least seven witnesses--Battaglia, Ashley, Burgess, Green, Fleischer, Schwartz and Davis--testified about the Regas organization.
 
 
 42
 Next, the government had to show that the defendants committed a violent crime. Vasquez-Velasco, 15 F.3d at 842; Concepcion, 983 F.2d at 381. The testimony of Herrera, as well as other percipient witnesses to the events of July 15, 1986, provided more than adequate evidence that the defendants participated in the kidnapping and beating.
 
 
 43
 Third, it was necessary to prove that the defendants were members of the racketeering enterprise. See United States v. Zuno-Arce 44 F.3d 1420, 1423-24 (9th Cir.1995) (discussing whether government had established defendant's membership in cartel in connection with Sec. 1959 conviction); Bledsoe, 674 F.2d at 667 n. 12 (stating that government must show defendant knowingly joined the enterprise). Gilmartin and Hogle argue that, at most, the evidence merely shows a loose association between themselves and the Regas organization based on a few isolated, arms-length drug deals. Further, the defendants argue that, in addition to proving membership in the enterprise, the government must show that the defendants committed at least two predicate acts (i.e. a "pattern") of racketeering. However, neither the plain language of Sec. 1959 nor the elements set forth in Vasquez-Velasco requires the government to prove that the defendants engaged in a pattern of racketeering activity. Commission of a single predicate act is sufficient to trigger the provisions of Sec. 1959.
 
 
 44
 With regard to Gilmartin's and Hogle's membership in the enterprise, the evidence showed that, prior to the kidnapping, they participated in more than a few isolated drug transactions. Beginning in early July, 1986, Troy Regas fronted four ounces of cocaine a day to Gilmartin and Hogle. Additionally, on July 13, 1986, the defendants began to search for Herrera in order to collect a drug debt for Jay Regas. They also searched Herrera's motel rooms looking for money and drugs to satisfy the debt. This testimony provides a sufficient basis for the jury's conclusion that Gilmartin and Hogle were members of Regas's enterprise. As for Garfinkle, the evidence of his association with Regas is so overwhelming that Garfinkle does not contend that he was not a member of the enterprise.
 
 
 45
 Finally, it was necessary to prove that the defendants kidnapped and beat Herrera for the purpose of maintaining or advancing their position in the racketeering enterprise. Vasquez-Velasco, 15 F.3d at 842. The testimony of Paul Ashley, Fleischer, Herrera and Special Agent Dell'Ergo provided a sufficient basis for the jury's conclusion that the defendants were acting to promote their positions within the Regas organization. Therefore, we find that the evidence was sufficient to support the defendants' convictions on count eight.
 
 
 46
 C. Is a Conviction on Count Eight a Necessary Prerequisite to a Conviction on Count Nine?
 
 
 47
 The defendants contend that the crime charged in count nine, the use of a firearm during a crime of violence, is dependent on count eight: If count eight is not supported by sufficient evidence, they argue, count nine likewise fails. Since we have determined that Hogle's, Gilmartin's and Garfinkle's convictions on count eight were supported by sufficient evidence, we reject their arguments relating to count nine. We affirm their convictions on that count.
 
 
 48
 This argument is more compelling in Bracy's case, however, because he was acquitted on count eight. Bracy acknowledges that the government was not required to charge him with the underlying crime of violence in count eight in order to charge him under count nine. See United States v. Hunter, 887 F.2d 1001 (9th Cir.1989) ("[A] defendant charged with violating section 924(c)(1) must be proven to have committed the underlying crime, but nothing in the statute or the legislative history suggests that he must be charged with and convicted of the underlying offense."), cert. denied, 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990). However, he argues that once the government chose to charge him on count eight, a conviction under that count became a prerequisite to a conviction under count nine. We disagree.
 
 
 49
 Bracy's acquittal on count eight does not mean that the government failed to prove that he committed the underlying crime of violence. Essentially, Bracy's conviction under count nine is inconsistent with his acquittal on count eight (i.e., the jury determined that he didn't commit the underlying crime of violence charged in count eight, but found that he did commit the underlying crime for purposes of count nine.) Faced with a similarly inconsistent verdict in United States v. Powell, 469 U.S. 57, 65, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984), the Supreme Court reaffirmed the principle that an inconsistent jury verdict, without more, is not grounds for reversal. See Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). We, too, have adhered to this rule. See, e.g., United States v. Hart, 963 F.2d 1278, 1281 (9th Cir.1992); United States v. Guzman, 849 F.2d 447, 448 (9th Cir.1988). Therefore, we affirm Bracy's conviction on count nine.
 
 IV. Jury Instruction No. 94
 A. Standard of Review
 
 50
 The defendants failed to object to the jury instruction they now challenge, so we review the instruction for plain error. United States v. Fagan, 996 F.2d 1009, 1016 (9th Cir.1993); United States v. Pazsint, 703 F.2d 420, 424 (9th Cir.1983).
 
 
 51
 B. Did the District Court Plainly Err By Giving Jury Instruction No. 94?
 
 
 52
 As it existed on July 15, 1986, 18 U.S.C. Sec. 924(c) did not include the use of a firearm during a drug trafficking offense as a basis for conviction. Rather, it was limited to the use of a firearm during a crime of violence. See 18 U.S.C.A. Sec. 924(c) (West Supp.1985). The amendment to Sec. 924(c) that added the provision regarding a "drug trafficking crime" did not become effective until November 1986, nearly five months after the Herrera kidnapping and beating. However, in jury instruction 94, the district court set forth the amended version Sec. 924(c), without explaining that the amended version could only be applied to offenses occurring after November 1986. The defendants argue that this constituted plain error.
 
 
 53
 The jury instruction was not plainly erroneous. In its instructions regarding the specific counts against each defendant, the district court provided sufficient guidance that any confusion caused by instruction 94 would have been resolved. In jury instruction 96, the court expressly stated that the offense charged in count eight is a crime of violence. Further, in jury instruction 99 the district court clearly described count nine as "using a firearm during and in relation to a crime of violence in violation of Section 924(c)." Nowhere in its instructions regarding counts eight and nine did the court intimate that the defendants could be convicted on those counts for using a firearm during a drug trafficking crime. Finally, in instruction 103, the court expressly noted that count twenty-three involved carrying a firearm during a drug trafficking crime that occurred in February 1988, after the effective date of the amendment to Sec. 924(c). Therefore, the district court did not commit plain error by giving jury instruction 94.
 
 V. Prosecutorial Misconduct Claims
 A. Standard of Review
 
 54
 If a defendant fails to object to prosecutorial misconduct at trial, the proper standard of review is plain error. United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989).
 
 
 55
 B. Did the Prosecutor's Argument Constitute Prosecutorial Misconduct?
 
 
 56
 During closing argument, the prosecutor argued that Bracy's and Hogle's testimony was not credible because "every time [the government] would ask Dave [Hogle] or Clayton Bracy a question about Perry Gilmartin, they would quickly look over to Perry. Because they are scared to death of him. He is the imminent source of evil in this courtroom--at this moment." Gilmartin argues that this portrayal of him was the prosecutor's personal belief and went beyond the evidence presented at trial. Hogle asserts that the statement also prejudiced him, because Hogle and Gilmartin were portrayed by the government as being inseparable.
 
 
 57
 The defendants' argument lacks merit. Although the prosecutor's statement may have gone beyond the evidence, it was a reasonable inference from the evidence presented. Given jury instruction 35, which permitted the jury to weigh a witness's credibility based on his manner and demeanor on the stand, and trial testimony regarding Gilmartin's violent conduct, intimidation tactics and witnesses' fear of Gilmartin, the prosecutor's statement was not unreasonable. Furthermore, the district court cautioned the jury that "[q]uestions, objections, statements, and arguments of counsel are not evidence in the case." This instruction neutralized any prejudicial effect the prosecutor's statement may have had. United States v. Baker, 10 F.3d 1374, 1415-16 (9th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).
 
 
 58
 Even if the prosecutor's argument were improper, reversal still would not necessarily be required. The plain error doctrine "authorizes the Courts of Appeals to correct only particularly egregious errors ... that seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (internal quotes and citations omitted). Taken in context, the prosecutor's comments, though unfortunate and unnecessary, do not rise to the level of plain error. Id. at 16, 105 S.Ct. at 1046.
 
 VI. Prior Bad Acts Evidence
 A. Standard of Review
 
 59
 Generally, the district court's admission of character evidence under Fed.R.Evid. 404(b) is reviewed for abuse of discretion. United States v. Sitton, 968 F.2d 947, 958 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 478, 121 L.Ed.2d 384 (1992). However, if no objection to the admission was raised, the court's decision to admit evidence is reviewed for plain error. United States v. Palmer, 3 F.3d 300, 304 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1120, 127 L.Ed.2d 429 (1994); United States v. Khan, 993 F.2d 1368, 1376-77 (9th Cir.1993).
 
 
 60
 B. Was the Testimony Improper "Propensity" Evidence?
 
 
 61
 Under Fed.R.Evid. 404(b), evidence of prior bad acts or crimes may not be used to prove that a defendant has a propensity to commit the crime charged. "This Rule has been interpreted as one of inclusion and generally allows admission of other crimes or acts except where it tends to prove criminal disposition." United States v. DeSalvo, 41 F.3d 505, 509 (9th Cir.1994) (internal quotes and citations omitted). This court applies a four-part test to determine whether evidence is admissible under Rule 404(b):
 
 
 62
 (1) there must be a sufficient degree of evidence for the jury to find that the other acts were in fact committed; (2) the other acts evidence may only be introduced to prove a material issue in the case; (3) the other acts must not be too remote in time to the conduct charged; and (4) the other acts must be sufficiently similar to the charged conduct when they are being introduced to show intent.
 
 
 63
 Id. (citing United States v. Ayers, 924 F.2d 1468, 1473 (9th Cir.1991)). See also United States v. Arambula-Ruiz, 987 F.2d 599, 603 (9th Cir.1993); United States v. Houser, 929 F.2d 1369, 1373 (9th Cir.1990). Neither the government nor the defendants discuss the elements of this test in their briefs.
 
 
 64
 The government elicited testimony about two incidents where Gilmartin fired a gun in a residential neighborhood. Also, Bracy was cross-examined about an incident where he and Gilmartin were found in possession of a handgun during a traffic stop. (The government also mentioned that Bracy and Gilmartin were arrested after the gun was found, in spite of the district court's ruling disallowing that evidence. The court admonished the jury to disregard the improper question.). The defendants argue that this evidence was unduly prejudicial and therefore inadmissible under Rule 404(b).
 
 
 65
 The government maintains that the evidence was relevant to the conspiracy charges because they showed Gilmartin possessed guns during a time when he was involved in drug trafficking. See United States v. Fagan, 996 F.2d 1009, 1015 (9th Cir.1993) ("It is well-settled that in a trial on drug trafficking charges, firearms are relevant and admissible to prove the defendant's involvement in the drug trade and intent to distribute."). Also, the government asserts that it proffered the evidence for impeachment purposes and to show the state of mind of the witnesses.
 
 
 66
 The problem with the government's contention is that during closing arguments the prosecutor essentially argued that the evidence showed Gilmartin's predisposition and propensity to violence. He stated:
 
 
 67
 That is more evidence, another incidence of the reckless violence engineered by Perry Gilmartin but for which these other defendants are responsible. It doesn't stop there. You remember testimony from the house he went out and was firing a gun in the backyard of a residential neighborhood. It shows the recklessness.
 
 
 68
 Between an elementary school and middle school and between a bunch of churches you go do that in the afternoon. Your first reaction is nobody would do that. Perry Gilmartin did that. You know that. And for the same reason you can see why they would in broad daylight go kidnap somebody from the Sparks Lodge over a $4,000 drug debt....
 
 
 69
 Then finally we have Gilmartin shooting off a gun in the backyard of Marne Drive, which is crazy, but consistent with what you know about this very violent young man.... This circumstantially corroborates that [the Herrera kidnapping] happened as incredible as it may be.
 
 
 70
 The government's closing argument showed that it intended to use the evidence to demonstrate Gilmartin's actions were consistent with his recklessly violent nature. Such a purpose is proscribed by Rule 404(b), and it fails the second prong of the DeSalvo test. 41 F.3d at 509 (bad acts evidence may only be used to prove a material issue).
 
 
 71
 Although the admission of the evidence was erroneous, it does not constitute plain error. The defendants did not object to the testimony or to the prosecutor's argument. There was plenty of other evidence connecting the defendants to the Herrera kidnapping and beating. We hold that the evidence of prior bad acts did not affect the "substantial rights" of the defendants because they failed to demonstrate that it changed the outcome of the trial. See Fed.R.Crim.P. 52(b); United States v. Olano, 507 U.S. 725, ---- - ----, 113 S.Ct. 1770, 1776-78, 123 L.Ed.2d 508 (1993) (holding that the defendant bears the burden of proving prejudice in Rule 52(b) cases).
 
 VII. Severance of the Case
 A. Standard of Review
 
 72
 Garfinkle urges us to evaluate this issue as one of prosecutorial misconduct involving a mixed question of fact and law which would be reviewed de novo. See United States v. Spillone, 879 F.2d 514, 520 (9th Cir.1989), cert. denied, 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990).
 
 
 73
 B. Were Garfinkle's Due Process and Fair Trial Rights Violated by Being Tried Before the Defendants on Whose Conduct His Vicarious Liability Was Based?
 
 
 74
 After most of the original defendants had made motions for severance, the government filed a proposal suggesting that the four defendants in this case be severed and tried first. The proposal's stated purpose was to promote efficiency and to encourage members of the second group of defendants to cooperate in order to mitigate their liability.
 
 
 75
 Garfinkle argues that this proposal constituted prosecutorial misconduct because the government "obviously had in mind that these four defendants would be faced with going to trial on counts 13-25, knowing their only possible criminal liability on these counts would be only through a vicarious liability/ Pinkerton theory."[7] Garfinkle contends that the severance presented the defendants with the dilemma of defending themselves against crimes "of which they had absolutely no knowledge."[8] Garfinkle's point is bolstered because, while he was convicted on count twenty-three (use of a firearm during drug trafficking), the Regas defendants on whose conduct his liability depended were acquitted of the corresponding charge at the later trial. He argues that had he been able to present the same defense as the Regas defendants, he, too, would have been acquitted on count twenty-three.
 
 
 76
 In response, the government initially argues that Garfinkle waived his severance argument by not raising it after the government rested. See United States v. Yarbrough, 852 F.2d 1522, 1531 (9th Cir.1988) ("A motion for severance must be made both before trial and at the close of the prosecution's case-in-chief to preserve the issue for appeal."). The government's argument is inapposite. Garfinkle is not appealing the denial of a severance motion, he is merely claiming that the method the court used to sever the defendants was inappropriate. Furthermore, contrary to the government's claim, it appears that Garfinkle did raise this issue after the government's case. At the hearing on the Rule 29 motions, Garfinkle's counsel discussed the problems presented by the government's use of Pinkerton, effectively preserving the issue for appeal. Therefore, we reach the merits of Garfinkle's severance argument.
 
 
 77
 Although the subsequent acquittal of the Regas defendants on the corresponding count to count twenty-three may seem somewhat unfair, we reject Garfinkle's argument. He offers nothing more than conjecture that the government's motives for proposing the manner of severance were improper, and he points to no case law that would prevent trying him before his severed co-conspirators. Additionally, Garfinkle was not completely precluded from learning what defenses might have been available to the Regas defendants. He was given the opportunity to interview Carl Wheeler, one of the severed defendants, and he does not claim that the government failed to disclose any additional pertinent information during discovery. Finally, Garfinkle does not show prejudice because he fails to demonstrate that the Regas defendants possessed any exculpatory evidence, or that they would have testified on his behalf had the case had not been severed.
 
 VIII. Garfinkle's Sentence
 A. Standard of Review
 
 78
 The district court's determination that a defendant's conviction falls within the scope of the Sentencing Guidelines is reviewed de novo. United States v. Robinson, 967 F.2d 287, 293 (9th Cir.1992). The factual findings underlying the sentence are reviewed for clear error. United States v. Buenrostro-Torres, 24 F.3d 1173, 1174 (9th Cir.1994).
 
 
 79
 B. Do the Sentencing Guidelines Apply to Garfinkle's Conviction?
 
 
 80
 In a corollary to his severance argument, Garfinkle challenges the application of the Sentencing Guidelines to his conviction because the last overt act committed directly by him occurred on October 2, 1986, over a year prior to the Guidelines' effective date. According to Garfinkle, the scope of the Sentencing Guidelines is more narrow than the broad coverage of Pinkerton liability, so even if he can be convicted of overt acts committed by the Regas defendants, those acts were not sufficiently "foreseeable" to trigger application of the Guidelines. See USSG Sec. 1B1.3, comment. (nn. 1-2) ("[A] defendant is accountable for the conduct ... of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.").
 
 
 81
 This court's decisions in United States v. Castro, 972 F.2d 1107, 1111-12 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993); and United States v. Gray, 876 F.2d 1411 (9th Cir.1989), cert. denied, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 497 (1990), control this issue. In those cases, we decided that continuing offenses, like conspiracy, which are initiated before, but not concluded until after the effective date of the Guidelines, are subject to sentencing under the Guidelines. Therefore, because the overt acts committed by Garfinkle's co-conspirators were in furtherance of the conspiracy and were reasonably foreseeable by him, we affirm the district court's decision to apply the Sentencing Guidelines to Garfinkle.
 
 
 82
 C. Did the District Court Err in Calculating the Amount of Narcotics for Sentencing Purposes?
 
 
 83
 The government bears the burden of proving, by a preponderance of the evidence, the amount of drugs for purposes of calculating a defendant's sentence under the Guidelines. United States v. Restrepo, 946 F.2d 654, 656-57 (9th Cir.1991) (en banc) ("[T]he preponderance standard of fact-finding generally is adequate to protect any interests a properly convicted defendant retains at sentencing."); see also United States v. Wilson, 900 F.2d 1350, 1353-54 (9th Cir.1990) ("We hold ... that district courts are constitutionally required to make factual determinations underlying application of the Guidelines by at least a preponderance of the evidence."). Garfinkle argues that the amount of drugs on which his sentence was based is not supported by the facts.
 
 
 84
 The government presented Exhibit 1 as evidence of the total quantity of narcotics involved in the conspiracy. The district court concluded that this satisfied the government's burden of proving the amount attributable to Garfinkle.
 
 
 85
 In United States v. Petty, 992 F.2d 887, 890 (9th Cir.1993), this court held that "[u]nder the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators." The evidence showed that Garfinkle was heavily involved in and intimately familiar with the Regas drug distribution conspiracy. Therefore, the district court did not err in determining Exhibit 1 was within "the scope" of Garfinkle's agreement.
 
 CONCLUSION
 
 86
 For the foregoing reasons, the defendants' convictions and Garfinkle's sentence are AFFIRMED.
 
 
 
 [1]
 The district court severed the original defendants into two groups--the four appellants here went to trial first. The second group went to trial on a fifth superseding indictment that was filed during the appellants' trial. The Regas defendants are not parties to this appeal
 
 
 [2]
 Many of the facts in this section are derived from the trial testimony of Rene Herrera, a government witness. We note that Bracy also testified at trial, and that his account of the events is markedly different. Gilmartin's, Hogle's, and Garfinkle's factual statements also differ from Herrera's account. When this court reviews the sufficiency of the evidence, however, it must view the facts in the light most favorable to the government. United States v. Restrepo, 930 F.2d 705, 708 (9th Cir.1991). Our statement of facts is presented in this light
 
 
 [3]
 Even were we to address the second prong of the Butz test, the defendants would not prevail. As noted in the discussion of the statute of limitations, supra, Part I.B., the district court's determination that the government had legitimate reasons for the delay is not clearly erroneous. Although this case involved a particularly lengthy investigation, there is nothing in the record to indicate that the delay was "undertaken by the Government solely 'to gain tactical advantage over the accused.' " United States v. Lovasco, 431 U.S. 783, 795, 97 S.Ct. 2044, 2051, 52 L.Ed.2d 752 (1977) (quoting United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971))
 
 
 [4]
 The defendants in the Regas case filed a motion for sanctions based on the government's delayed disclosure of the impeachment evidence. The district court denied their motion because although the disclosure was untimely, it did not preclude impeachment because the court allowed cross-examination of Fleischer after the information was disclosed. The defendants in this case did not have the same impeachment opportunity
 
 
 [5]
 The NCIC printout contained no information about Fleischer's fraudulent insurance claim. However, the government did not know that Fleischer had filed the false burglary report or committed insurance fraud until he disclosed that information on the witness stand. The government "has no duty to volunteer information that it does not possess or of which it was unaware." United States v. Chen, 754 F.2d 817, 824 (9th Cir.1985)
 
 
 [6]
 Although Bracy was found not guilty on count eight, he raises the sufficiency of evidence argument in connection with his challenge to his conviction on count nine. See, infra, part III.C
 
 
 [7]
 In Pinkerton v. United States, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 1183-84, 90 L.Ed. 1489 (1946), the Supreme Court held that a member of a conspiracy may be held liable for the substantive crimes committed by his co-conspirator in furtherance of the conspiracy
 
 
 [8]
 Garfinkle's counsel wrote to the attorneys representing the Regas defendants, seeking permission to interview their clients and even call the Regas defendants as witnesses in the first trial. His request was uniformly rejected. (Counsel for Carl Wheeler did make his client available for an interview but refused to let him be called as a witness)