**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

    v.

ARTURO SANCHEZ, JR.,
          *Defendant-Appellant.*

No. 10-50192

D.C. No.
3:08-cr-02529-L-1

OPINION

Appeal from the United States District Court
for the Southern District of California
M. James Lorenz, District Judge, Presiding

Argued and Submitted
May 4, 2011—Pasadena, California

Filed November 1, 2011

Before: Harry Pregerson, Raymond C. Fisher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

19805

**COUNSEL**

Carlos Arguello, II, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

David J. Zugman, San Diego, California, for the defendant-appellant.

**OPINION**

PREGERSON, Circuit Judge:

Arturo Sanchez appeals his convictions for importation and possession of cocaine. He asserts that the last statement made by the prosecution in its closing rebuttal argument rendered the trial unfair. Sanchez further asserts that the district court erred in denying his request for closing surrebuttal on his duress defense. We hold that the prosecutor's inflammatory remarks delivered at the end of his closing rebuttal argument were improper and prejudicial. We reverse Sanchez's convictions and remand for a new trial.

BACKGROUND

### 1.  The offense

On May 26, 2008, Arturo Sanchez entered the United States from Mexico at the Calexico, California port of entry driving a 2002 Passat. A customs officer referred Sanchez to secondary inspection. There a narcotics detector dog alerted to the rear side of the vehicle. A search revealed hidden compartments containing 29 kilograms, or 64 pounds, of cocaine.

An Immigration and Customs Enforcement special agent then interviewed Sanchez. Sanchez told the special agent that he knew that drugs were hidden in his vehicle, but that he was told it was marijuana. Sanchez told the special agent he was paid $700 to carry the drugs across the border. Sanchez also told the special agent that he was afraid of the people who gave him the drugs to transport, and that they knew where he lived in Mexico. Sanchez asked the special agent, "Can you help me?" Sanchez said he needed help because his family was in Mexico, which the special agent assumed meant Sanchez was concerned for his family's safety. When the special agent asked Sanchez to help him track down Sanchez's accomplices, Sanchez said he wanted his family to be safe. Later, Sanchez tried to call his family in Mexico, but the call did not go through.

Sanchez was indicted for importation of cocaine in violation of 21 U.S.C. §§ 952, 960, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). At trial, the customs officers and the special agent testified regarding their interactions with Sanchez.

### 2.  Sanchez's testimony

Sanchez took the stand and testified that, although he knew he was driving a vehicle containing drugs, he had done so under duress because drug traffickers had threatened his fam-

ily. Sanchez testified that he is a U.S. citizen living in Mexico with his wife and children. He met the drug traffickers in March 2008 in Calexico, where Sanchez was looking for work as a carpenter. When the traffickers learned Sanchez was a U.S. citizen, they asked if he would transport marijuana across the border for them. Sanchez refused, having been convicted once before for transporting marijuana in 2005.

Over the next several weeks Sanchez twice encountered the traffickers, and each time they were more threatening. He testified that the traffickers told him if he did not transport the drugs for them, they would do something to his family. Sanchez believed the men were capable of carrying out this threat because he knew the Mexican drug cartels were very violent. Thus, he agreed to transport the drugs to the United States. Sanchez testified he never called the Mexican police because he believed they were corrupt and in the pocket of the drug traffickers. Nor did he tell his wife, for fear that she would tell her mother, who might go to the police.

On cross-examination, Sanchez acknowledged that he never expressly told the border authorities that he had been forced to transport the drugs or that he was afraid the traffickers would hurt his family, because he did not feel safe doing so. He did ask the border authorities for help protecting his family, but did not explain why he feared for his family's safety.

### 3.   Closing arguments

Before closing arguments, Sanchez's attorneys requested that they be granted surrebuttal following the prosecutor's closing rebuttal argument because Sanchez had the burden of proving duress. The court denied the request. The court instructed the jury that Sanchez bore the burden of proving duress by a preponderance of the evidence. The court also instructed the jury that arguments, statements, questions, and

objections by the lawyers did not constitute evidence, and could not be considered "in deciding what the facts are."

The prosecutor delivered his closing argument, followed by the defense counsel's closing argument. The prosecutor then commenced his rebuttal with remarks about the law of duress. The defense counsel objected that the prosecutor was misstating the law. Instead of ruling on the objection, the court responded by reminding the jury to follow the court's instructions, and by telling the jury that "what the lawyers say is not evidence."

At the end of his rebuttal, the prosecutor stated that the defense counsel was asking the jury to believe Sanchez's duress claim even though Sanchez had said nothing about fearing for his family's safety to the customs officers at primary or secondary inspection or to the ICE special agent. The prosecutor then said:

> [W]hy don't we send a memo to all drug traffickers, to all persons south of the border and in Imperial County and in California—why not our nation while we're at it. Send a memo to them and say dear drug traffickers, when you hire someone to drive a load, tell them that they were forced to do it. Because even if they don't say it at primary and secondary, they'll get away with it if they just say their family was threatened. Because they don't trust Mexican police, and they don't think that the U.S. authorities can help them. Why don't we do that?

Following this "send a memo" statement, the court said "Okay. All right. Ladies and gentlemen, we have concluded." The bailiff was sworn and told to take the jury into the jury room. After just over an hour of deliberation, the jury found Sanchez guilty on both counts of the indictment. Sanchez timely appealed.

## DISCUSSION

Sanchez contends that the "send a memo" statement made by the prosecutor during his closing rebuttal was improper argument. Sanchez did not raise this objection before the district court. Thus, we review for plain error. *United States v. Weatherspoon*, 410 F.3d 1142, 1150-51 (9th Cir. 2005). Under the plain error standard, we can only reverse Sanchez's convictions if (1) the "send a memo" statement was improper, and (2) the statement "substantially prejudice[d] [the] defendant's trial." *United States v. Koon*, 34 F.3d 1416, 1445 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996). Even if both prongs of the test are met, "[t]he plain error doctrine 'authorizes the Courts of Appeals to correct only particularly egregious errors . . . that seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Bracy*, 67 F.3d 1421, 1432 (9th Cir. 1995) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

## 1.  Impropriety

[1] "[P]rosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." *United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (quoting *Koon*, 34 F.3d at 1443) (internal quotation marks omitted). Similarly, prosecutors may not "point to a particular crisis in our society and ask the jury to make a statement" with their verdict. *United States v. Leon-Reyes*, 177 F.3d 816, 823 (9th Cir. 1999); *see also United States v. Williams*, 989 F.2d 1061, 1072 (9th Cir. 1993) (improper to exhort jury to "[t]ell these defendants that we do not want [methamphetamine] in Montana" (alteration in original)). Nor can prosecutors comment on "the potential social ramifications of the jury's reaching a . . . verdict." *Weatherspoon*, 410

F.3d at 1149 (improper for prosecutor to say that "finding this man guilty is gonna protect other individuals in this community"). Further, it is improper to make "statements designed to appeal to the passions, fears and vulnerabilities of the jury." *Id.*

**[2]** The prosecutor's "send a memo" statement urged the jury to convict "for reasons wholly irrelevant to [Sanchez's] guilt or innocence." *Nobari*, 574 F.3d at 1076. The point of the "send a memo" statement was that if the jury acquitted Sanchez based on his duress defense, the verdict would in effect send a message to other drug couriers to use that defense themselves. This message would extend "to all drug traffickers, to all persons south of the border and in Imperial County and in California—why not our nation while we're at it." The obvious implied consequence of such a message would be increased lawbreaking, because couriers would be less afraid of conviction. Thus, by his "send a memo" statement, the prosecutor was encouraging the jury to come to a verdict based not on Sanchez's guilt or innocence, but on the "potential social ramifications" of the verdict. *Weatherspoon*, 410 F.3d at 1149. This was improper argument.

**[3]** The government contends that the "send a memo" statement was "fair comment on the arguments raised in the defense's closing argument." Appellee's Br. at 21. The government asserts that the statement merely "served to impress upon the jury that Sanchez advocated a wholly unreasonable position" and "[Sanchez] was really trying to avoid criminal liability on facts that anyone could assert at any time, whether true or not." *Id.* But the prosecutor could easily have made these points without implying that other criminals would be encouraged by Sanchez's acquittal. Instead, the prosecutor chose to present the argument in a manner that urged the jury to look beyond the facts of the particular case, and to consider that an acquittal might lead to future lawbreaking not just by Sanchez, but by drug couriers throughout the United States and Mexico. The prosecutor's statement did not merely com-

ment on the evidence and arguments in the case, but also "appeal[ed] to the passions, fears and vulnerabilities of the jury" by suggesting that an acquittal would make it easier for drugs to come into the United States. *Weatherspoon*, 410 F.3d at 1149. Thus, we conclude that the "send a memo" statement was improper argument.

## 2.   Prejudice

Under the plain error standard, "reversal is appropriate 'only if the prosecutor's improper conduct so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict and deprived [the defendant] of a fair trial.' " *Weatherspoon*, 410 F.3d at 1151 (quoting *United States v. Smith*, 962 F.2d 923, 935 (9th Cir. 1992)). Put another way, "[w]hen prosecutorial conduct is called in question, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990).

**[4]** To determine whether prosecutorial misconduct has deprived a defendant of a fair trial, we look to the substance of any curative instructions, and the strength of the case against the defendant absent the misconduct. *See Weatherspoon*, 410 F.3d at 1151.

### A.   Curative instructions

The prosecutor's "send a memo" statement that an acquittal would encourage future lawbreaking throughout the United States and Mexico was the last part of his closing rebuttal argument. The defense counsel raised no objection, and the district court made no comment about the prosecutor's statement. Instead, the court declared closing arguments concluded and sent the jury to the jury room to deliberate. Thus, there was no curative instruction to mitigate the prejudice of the "send a memo" statement.

The government argues that because the district court instructed the jury on two occasions before the "send a memo" statement that "what the lawyers say is not evidence," the "potential effect of [the] prosecutor's misstatements" was neutralized. Appellee's Br. at 23. This argument is unavailing. We have held that curative instructions fail to "neutralize the harm" of improper statements by a prosecutor when " '[t]hey [do] not mention the specific statements of the prosecutor and [are] not given immediately after the damage [is] done.' " *Weatherspoon*, 410 F.3d at 1151 (quoting *United States v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992)).

**[5]** The district court's jury instructions do not meet the *Weatherspoon* test. Before closing arguments, the district court gave an instruction that arguments, statements, questions, and objections by lawyers are not evidence. Then, immediately before the prosecutor's "send a memo" statement, the district court responded to an objection by the defense by reminding the jury to follow the jury instruction on the legal requirements of duress, and not to consider the lawyers' statements as evidence. Advising a jury that lawyers' statements are not evidence is not equivalent to advising it to consider only the facts of the immediate case, rather than the possible societal consequences of its ruling. Morever, once the "send a memo" statement was made, the district court did not address that specific statement, and gave no curative instruction. Thus, under *Weatherspoon*, the district court failed to neutralize the harm caused by the prosecutor's "send a memo" statement.

We acknowledge that Sanchez's counsel bears some responsibility for the error. Had the defense objected to the prosecutor's rebuttal, we have no doubt the district court would have issued a strongly worded curative instruction. But "even in the absence of objections by defense counsel, a 'trial judge should be alert to deviations from proper argument and take prompt corrective action as appropriate.' " *Id.*

**[6]** The government cites to various cases for the proposition that a general jury instruction can "neutralize the effect of a prosecutor's misstatements," but these cases are distinguishable. In *United States v. Bracy*, the prosecutor in closing argument suggested that the demeanor of two of the defendants during their cross-examinations indicated that they were afraid of their third co-defendant, "the imminent source of evil in this courtroom." 67 F.3d at 1431. On appeal, we found these statements to be "a reasonable inference from the evidence presented." *Id.* Specifically, the jury had already heard evidence of the co-defendant's "violent conduct" and "intimidation tactics," and the fact that witnesses were afraid of him. *Id.* Moreover, it was not improper for the jury "to weigh a witness's credibility based on his manner and demeanor on the stand." *Id.* We held that, under these circumstances, a general jury instruction declaring that "questions, objections, statements, and arguments of counsel are not evidence" was sufficient to neutralize any prejudice. *Id.* (alteration omitted)

**[7]** Unlike in *Bracy*, the "send a memo" statement in the instant case was not a reasonable inference from the evidence, nor did it relate to matters the jury was entitled to consider. A defendant's demeanor in the courtroom is arguably relevant to determining his guilt or innocence, and in determining his credibility. Thus, the statements in *Bracy* were not clearly improper. In Sanchez's case, however, the prosecutor was not commenting on the defendant, but on the potential adverse consequences of an acquittal, namely that the acquittal would encourage and facilitate lawbreaking. The "send a memo" rhetoric was designed to arouse and inflame the jury to return a guilty verdict based on passion and prejudice. *Bracy* does not compel the conclusion that a generalized jury instruction that the statements of counsel are not evidence is sufficient to dispel the level and type of prejudice generated by the prosecutor in this case.

In *United States v. Amlani*, the prosecutor at the beginning of his closing argument referred to the Seventh Command-

ment as the source of the law against stealing. 111 F.3d 705, 714 (9th Cir. 1997). The defendant argued that this was an "appeal to religious prejudice." *Id.* We held that this "arguable appeal to the parochial inclinations of [a] jury" was harmless. *Id.* The biblical reference was logically connected to humorous statements made by the defendant regarding an imaginary Eleventh Commandment, and the prosecutor also linked the Seventh Commandment back to the specific federal statutes under which the defendant was charged. *Id.* In this context, a general jury instruction was adequate to address any prejudice from the biblical reference. *Id.*

Whereas the reference to the Seventh Commandment in *Amlani* was a minor point made at the beginning of the prosecutor's closing argument, the "send a memo" rhetoric in Sanchez's case was invoked by the prosecutor at the end of his closing rebuttal argument, after which the jury commenced its deliberations. *See United States v. Carter*, 236 F.3d 777, 788 (6th Cir. 2001) (finding it significant that "[t]he prosecutor's improper comments occurred during his rebuttal argument and therefore were the last words from an attorney that were heard by the jury before deliberations."). Given the timing, the impact was likely to be significant, and the court did not intervene.

Moreover, unlike in *Amlani*, the "send a memo" statement was not logically connected to the testimony of Sanchez, or to the elements of duress; instead, it was a policy argument against acquittal. The statement in *Amlani* was not even an argument in and of itself, but an effort to emphasize that stealing is wrong, something of which the jury did not need to be reminded. The "send a memo" statement, in contrast, was a fully developed argument raising the specter of future lawbreaking to divert the jury from its obligation to reach a verdict based only on the evidence. Thus, the challenged

statement in *Amlani* was far less prejudicial than the "send a memo" statement.[1]

**[8]** Therefore, we hold that the general instructions the district court gave to the jury were insufficient to mitigate the prejudice of the "send a memo" statement.

## B.  Strength of the government's case

As we stated in *Weatherspoon*,

> Another important factor contributing to the prejudicial effect of improper statements is the strength of the case against a defendant. When the case is particularly strong, the likelihood that prosecutorial misconduct will affect the defendant's substantial rights

---

[1]The other cases the government cites are also unavailing. In *United States v. McChristian*, the general jury instruction was just one of several factors weighing against reversal. The court also held that there was overwhelming evidence of the defendant's guilt and that the defendant's argument had invited most of the errors. 47 F.3d 1499, 1508 (9th Cir. 1995). As will be discussed below, the evidence of Sanchez's guilt (more specifically, the evidence that he was lying about the threat to his family) was not overwhelming. Further, by merely putting forth a duress defense Sanchez did not invite a statement that juries who accept such defenses are encouraging future lawbreakers. Thus, *McChristian* is distinguishable.

The government's final cited case, *Tak Sun Tan v. Runnels*, 413 F.3d 1101 (9th Cir. 2005), is distinguishable from the instant case for four reasons: (1) the conviction was reviewed under the highly deferential standard mandated by the Antiterrorism and Effective Death Penalty Act (*id.* at 1111), unlike the direct review in Sanchez's case; (2) the *Tan* court found that the prosecutor had not acted improperly at all (*id.* at 1115), whereas here the prosecutor's statement was clearly improper; (3) the evidence against the *Tan* defendants was substantial (*id.*), whereas in Sanchez's case the evidence that he fabricated his duress defense was not substantial; (4) and the *Tan* trial court gave continuous instructions to the jury throughout the trial to mitigate any prejudice (*id.*), whereas in Sanchez's case the court gave two general instructions, and did nothing to mitigate the prejudice after the "send a memo" statement was made. Thus, *Tan* is unavailing to the government.

is lessened because the jury's deliberations are less apt to be influenced. But as the case becomes progressively weaker, the possibility of prejudicial effect grows correspondingly.

410 F.3d at 1151. In *Weatherspoon*, we found that the prosecutor had impermissibly vouched for the credibility of his witnesses, and had encouraged the jury to convict with improper statements such as, "Convicting Mr. Weatherspoon is gonna make you comfortable knowing there's not convicted felons on the street with loaded handguns," and "finding this man guilty is gonna protect other individuals in this community." *Id.* at 1146-50. We further concluded that the government's evidence against the defendant was not particularly strong: "This was a comparatively close case that boiled down to a battle over credibility." *Id.* at 1151-52. Thus, the "prosecutorial statements that vouch[ed] for the credibility of witnesses and that encourage[d] the jury to act based on considerations other than the particularized facts of the case pose[d] a real danger to the defendant's right to a fair trial." *Id.* at 1152. Because the trial court had not given an effective curative instruction to remedy the unfairness, we reversed the conviction for plain error. *Id.*

**[9]** As in *Weatherspoon*, Sanchez's case came down to a "battle over credibility." There was no dispute that he had committed all the elements of the crimes he was charged with, so the entire question of guilt or innocence centered on whether Sanchez had committed the crimes under duress. The only evidence Sanchez put forth to support his duress defense was his own testimony and statements he made to the border officials at the time of his arrest. To contest this evidence, the prosecutor argued that Sanchez had not mentioned to the border officials that he had agreed to transport drugs across the border under duress. Sanchez countered that the American authorities would not have been able to help him or his family living in Mexico, so telling them he had been forced to transport the drugs would serve no purpose. In short, there was no

clear evidence either way. This case came down to a credibility determination—if the jury believed Sanchez, they would acquit him.

**[10]** Because the sole issue in Sanchez's case centered on witness credibility, the "send a memo" statement likely affected the jury's ability to decide the case fairly. We cannot comfortably assume that the jury would have convicted Sanchez absent the prosecutor's misconduct, given the scarcity of evidence for either side on the duress claim, other than Sanchez's testimony. Moreover, the prosecutor presented the "send a memo" rhetoric during his rebuttal, thus ensuring that it was the last argument the jury heard before going to the jury room to deliberate. This timing increased the risk that the inflammatory statement would improperly influence the jurors. *See Carter*, 236 F.3d at 788. Under these circumstances, we hold that the prosecutor's "send a memo" argument " 'affected the jury's ability to consider the totality of the evidence fairly.' " *Weatherspoon*, 410 F.3d at 1152 (quoting *Smith*, 962 F.2d at 935).[2]

## CONCLUSION

**[11]** Given the extent of the prosecutor's misconduct in suggesting that Sanchez's acquittal would encourage future lawbreaking, and the high risk that the misconduct influenced the jury's deliberations, we hold that the "send a memo" statement "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Bracy*, 67 F.3d at 1432 (quoting *Young*, 470 U.S. at 15). We reverse Sanchez's con-

---

[2]Our analysis is not affected by our recent decision in *United States v. Ibarra-Pino*, ___ F.3d ___, 2001 WL 4359925 (9th Cir. Sept. 20, 2011). The government has not argued that the district court erred by allowing Sanchez to present a duress defense to the jury or by providing the jury with a duress instruction. *Ibarra* is therefore inapplicable.

victions for plain error and remand for a new trial.[3]

**REVERSED AND REMANDED.**

---

[3]Because we remand for a new trial, we do not reach Sanchez's claim that the district court improperly denied him surrebuttal.